[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 19, 2001
THOMAS K. KAHN
CLERK

No. 00-14322

————————————

D. C. Docket No. 97-00045-CV-BAE-4

MICHAEL WOODEN,
TERRY BRATCHER, Dr., et al.,

Plaintiffs-Appellants,

versus

BOARD OF REGENTS OF THE UNIVERSITY
SYSTEM OF GEORGIA, STEPHEN R. PORTCH,
Dr., et al.,

Defendants-Appellees,

GEORGIA STATE CONFERENCE NAACP,
SOUTHERN CHRISTIAN LEADERSHIP
CONFERENCE, et al.,

Intervenor-Defendants-
Appellees.

————————————

Appeal from the United States District Court
for the Southern District of Georgia

————————————

**(April 19, 2001)**

Before BLACK and MARCUS, Circuit Judges, and HANCOCK[*], District Judge.
MARCUS, Circuit Judge:

---

[*]Honorable James H. Hancock, U.S. District Judge for the Northern District of Alabama, sitting by designation.

Plaintiffs appeal the district court's orders dismissing for lack of standing their race discrimination claims against officials of the University of Georgia System. This litigation actually encompasses two distinct claims. One group of Plaintiffs -- Tracy, Davis, and Green (collectively, "Tracy Plaintiffs") -- is composed of unsuccessful applicants to the University of Georgia; they allege that the Defendants' freshman admissions policies impermissibly favor non-whites over whites in violation of the Equal Protection Clause and federal civil rights statutes. A second group of Plaintiffs -- Wooden, Jarvis, and Bratcher (collectively, "Wooden Plaintiffs") -- is composed of individuals with ties to three historically black institutions ("HBIs") in Georgia's university system; they allege that operation of the HBIs unlawfully discriminates against non-blacks. In a series of orders, the district court dismissed the claims of all of these Plaintiffs for lack of standing; the court also denied the Plaintiffs' class certification motion, based primarily on its rulings regarding standing.

Because the district court correctly determined that Plaintiffs Davis and Tracy lack standing, we affirm that portion of the district court's orders. In addition, the Wooden Plaintiffs failed to file their notice of appeal in a timely fashion, so we lack jurisdiction to consider their challenge to the district court's orders dismissing their claims. We conclude, however, that the district court erred

2

by finding that Plaintiff Green lacks standing, and by rejecting on that basis

Green's request to serve as a class representative. Accordingly, we reverse the

district court's order entering summary judgment against Green for lack of

standing, and vacate the denial of class certification to the extent it was based on

the premise that Green lacks standing. The case is remanded to the district court

for further proceedings regarding Green's claim consistent with this opinion.

## I.

## A.

We begin by laying out the undisputed facts of the case, starting with those

facts relevant to the Tracy Plaintiffs' challenge to the freshman admission policies

at the University of Georgia ("UGA").[1]

UGA is the flagship institution of Georgia's university system. Admission

to UGA is competitive, and applications far exceed the number of available

freshman seats. To assemble a class, the faculty admission committee, in

conjunction with the admissions office, recommends a freshman admission policy

---

[1]The district court in this case has already stated in dicta its view that the UGA admissions policy discriminates unlawfully to the extent it gives certain applicants preferential treatment based on race at some stages of the admissions process. See, e.g., Tracy v. Board of Regents of the Univ. Sys. of Ga., 59 F. Supp. 2d 1314, 1321 (S.D. Ga. 1999). The district court reached the same conclusion in related litigation not before us today. Johnson v. Board of Regents of the Univ. Sys. of Ga., 106 F. Supp. 2d 1362 (S.D. Ga. 2000) (awarding relief to plaintiff-applicants rejected from UGA). We offer no opinion on that issue, as the appeal now before us concerns only standing.

each year. This policy is formally presented to UGA's president for approval, and thereafter is implemented by the admissions office.

Between 1990-1995, UGA's freshman admissions policy applied objective academic criteria differently depending upon whether an applicant characterized himself as "black" or "non-black." To be eligible for admission, an applicant had to meet certain pre-set minimums with respect to Scholastic Aptitude Test ("SAT") score, grade point average ("GPA"), and academic index ("AI").[2] Under the 1990-95 policy, the minimums for black students were set lower than the minimums for non-black students. Specifically, to be eligible for admission into the Fall 1995 class, a black applicant would have to obtain at least an 800 SAT score, a 2.0 GPA, and a 2.0 academic index. By contrast, a non-black applicant would have to obtain at least a 980 SAT score, a 2.5 GPA, and a 2.4 academic index.

This was the regime when plaintiff Kirby Tracy (who is white) applied for admission to UGA's Fall 1995 Class. Tracy had a GPA of 3.47 and a total SAT score of 830. Because he did not meet the minimum SAT requirement for non-blacks, UGA denied his application. It is undisputed, however, that Tracy would have been eligible for admission under the criteria applied to black applicants.

---

[2]The AI is a statistic that weighs and combines an applicant's SAT scores and GPA.

After his rejection from UGA, Tracy enrolled at Georgia College. Two years later, in 1997, he applied and won admission to UGA as a transfer student. The transfer application was filed shortly after this lawsuit was filed.[3] At the time of summary judgment in this case, Tracy remained a student at UGA.

Meanwhile, UGA -- concerned about the constitutionality of its dual-track admissions policy -- revised that policy in 1995 for the 1996 freshman class. With some minor modifications, that revised policy remained in effect at the time of summary judgment and appears to remain in effect today. The revised policy divides the admissions process into three stages. UGA selects the majority of its freshman class at an initial stage which applies objective academic criteria without regard to the applicant's race. At this initial stage (the "AI stage"), UGA admits automatically applicants whose academic indices and SAT scores are above a certain number. From the remaining applications, UGA selects for "further evaluation" a group of applicants whose academic indices are above a certain number and who meet minimum SAT score requirements. Applicants who fall below the minimum academic index or below the minimum SAT score

---

[3]It is unclear what criteria UGA uses to evaluate transfer applicants, although there is no dispute that those criteria are race-neutral.

5

requirement are automatically rejected.  To reiterate, race is not a consideration at the AI stage.

For each applicant placed in the pool for further evaluation, UGA calculates a Total Student Index ("TSI").  The TSI is based on a combination of weighted academic and demographic factors.  It is only at this stage that UGA, under its current policy, expressly considers an applicant's race.[4]  Applicants whose TSI scores meet a pre-set threshold are admitted automatically, while applicants whose scores fall below a pre-set minimum are rejected.  Applicants whose TSI scores fall between those numbers are then passed on to a third stage, where they are evaluated on an individual basis by admissions officers.  This is the "edge read" or "ER" stage.  At this final stage, all applicants still in the pool start with a score of zero, and ER readers look for qualities that might not have been apparent at the AI and TSI stages.  Applicants who receive an ER rating above a certain number are admitted, while those below that number are rejected.  Race is not designated as a factor at the ER stage, although the Plaintiffs contend that race is nevertheless taken into account in determining an ER score.

---

[4]UGA also considers, among other factors, Georgia residence, alumni relationships, extracurricular activities, and after-school work hours.

6

Two Plaintiffs in this case sought admission under the post-1995 revised policy (Tracy, as noted above, sought admission under the superseded 1990-95 policy). Plaintiff Ashley Davis, who is white, applied for admission to the 1996 Fall freshman class at UGA. She had a 980 SAT score, a 2.94 GPA, and a 2.21 academic index. Because her academic index was below 2.30 (the cut-off to advance to the TSI stage), UGA denied her application at the initial AI stage. It therefore did not compute a TSI for her, and did not consider race in rejecting her. Davis eventually enrolled as a freshman at the University of Tennessee, where she remained at the time of summary judgment. She has disclaimed any interest in transferring to UGA, and there is no indication that she would re-apply under the freshman admissions policy.

Plaintiff Craig Green, who is white, unsuccessfully sought admission to the Fall 1997 UGA freshman class. For the 1997 freshman class, UGA required an AI of 2.50 or above to be admitted at the initial AI stage, while applicants with an AI below 2.25 were rejected at that stage. Students whose AIs were between 2.25 and 2.50 proceeded to the TSI phase of consideration. Green was among that group of applicants, with an AI of 2.39 and a SAT equivalency score of 1170-90.

In calculating a TSI score for applicants to the 1997 freshman class, UGA awarded 0.5 points under the category "Demographic Factors" to applicants who

self-classified themselves as non-caucasian.[5]  Applicants who did not do so, such as Green, did not receive the 0.5 point credit.

After sorting applicants under the TSI process, UGA offered admission to all candidates with a TSI score of 4.40 or higher.  Applicants with a TSI score below 3.79 were rejected, while applicants whose TSI scores were between 3.79 and 4.39 proceeded on to the final ER stage.  Because of the 0.5 point credit given non-white applicants, however, white applicants were effectively held to a more rigorous standard.  In practice, awarding the 0.5 point credit to non-white applicants meant that white applicants needed a TSI score of at least 4.40 to be admitted at this stage, while non-white applicants needed only a 3.90.  Similarly, to avoid outright rejection at the TSI phase and proceed on to the ER phase, a white applicant effectively needed a TSI score of at least 3.79 TSI points, while a non-white applicant -- because of the 0.5 point boost -- needed only 3.29.

Green received a TSI score of 3.89, which included credits for his parents' educational level, his Georgia residency, his relatively high GPA/SAT equivalency

_____

[5]In 1996, the year in which Davis sought admission, bonus points were awarded under a category entitled "Ethnic Diversity."  The number of points awarded depended on the particular "ethnic code" (such as "B" for black) specified by the applicant.  It appears that black applicants were awarded a larger bonus than Hispanic or other "minority" applicants.  That distinction did not exist in 1997, when the awarding of bonus points turned simply on whether the applicant identified himself as "non-caucasian."  As shorthand in this opinion, we shall use "white" and "non-white" to refer to "caucasian" and "non-caucasian" when speaking of the 1997 policy.

score, and his male gender. On the basis of that score he was neither admitted nor rejected at the TSI stage, but instead went into the Edge Read pool. If Green had designated himself as non-white, his TSI score would have been 4.39 -- 0.5 points higher than it was, but still just barely below the 4.40 threshold for automatic admission. Accordingly, Green would have proceeded to the ER stage regardless of whether he received a 0.5 point credit due to his race.

At the ER stage, application files were individually read by at least two members of UGA's admissions office. UGA then offered admission to all applicants with an ER score above -0.5, and denied admission to all applicants with an ER score below -0.5. Each of the two Edge Readers who reviewed Green's application gave him an ER score of -2.0, the lowest possible. Because that score was well below the -0.5 cutoff for admission, UGA denied Green's application.

Green ultimately attended Dalton College in the Fall of 1997, but in 1998 sought to transfer into UGA. UGA denied his application because he lacked the necessary credit hours to transfer to UGA from a junior college. As stated by the district court, Green intends to reapply for admission to UGA as a transfer student once he earns the requisite credit hours.

9

B.

The claims of the Wooden Plaintiffs relate to an entirely different set of facts. These Plaintiffs object to Defendants' alleged failure to "desegregate" adequately three HBIs: Ft. Valley State University, Savannah State University, and Albany State University. Plaintiff Wooden, who is black, asserts that although he would have liked to enroll his daughter at nearby Savannah State, he refused to allow her to attend a segregated campus. Plaintiff Jarvis, who is white, is a former student at Ft. Valley; he alleges that the school's continued segregation adversely affected his educational experience and undermines the reputational value of his degree. Plaintiff Bratcher, who is white, is on the faculty at Ft. Valley; she contends that the school's hostility to whites adversely affects her work and makes the school inferior. None of these Plaintiffs is a current student at an HBI, which all parties concede remain predominantly black today and Plaintiffs contend are de facto bastions of segregation (for example, they observe that there are separate student unions for white and black students).[6]

---

[6]The only Wooden Plaintiffs before us today are Wooden, Jarvis, and Bratcher. In their brief Plaintiffs discuss a fourth Wooden Plaintiff, Marie McConnell, but McConnell was voluntarily dismissed from the case on October 14, 1998, and is not a party to the appeal. Plaintiffs also discuss a fifth Wooden Plaintiff, Ruth Harris, but make no argument about her and do not even mention her, let alone argue on her behalf, in their brief.

## C.

Plaintiffs filed their complaint on March 3, 1997. The complaint originally named eleven individuals as Plaintiffs; all but four of those individuals (and six of the seven of the Plaintiffs participating in this appeal) are white. Named as Defendants were the Board of Regents of the University System of Georgia and the Chancellor of the system, Dr. Stephen Portch. Plaintiffs sought damages and injunctive relief on race discrimination theories under the Equal Protection Clause (via 42 U.S.C. § 1983), 42 U.S.C. § 1981, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq. The Georgia branch of the NAACP, the Southern Christian Leadership Conference, and various African-American individuals later moved successfully to intervene as Defendants. Green was later added as an additional Plaintiff.

Plaintiffs eventually moved for class certification, seeking certification of an extremely broad class of persons allegedly affected by Defendants' discriminatory practices. Plaintiff Tracy moved separately for partial summary judgment on his claim. Defendants moved for summary judgment in their favor on all claims.[7]

---

[7]Plaintiff Davis also moved for leave to amend her complaint to add allegations of sex discrimination. The district court denied that motion. Although Plaintiffs state that they seek review of that decision, they do not address the district court's ruling in their brief, and instead simply argue that Davis has standing. For the same reasons that Davis lacks standing to pursue her allegation that the UGA admissions process unlawfully gives preferential treatment to non-white applicants, she lacks standing to challenge UGA's allegedly preferential treatment of

11

In an order dated January 6, 1996, the district court found that Tracy had established his claim of unlawful past discrimination, and therefore granted his motion for partial summary judgment. The court reserved ruling on the recoverability of compensatory damages, and also reserved ruling on the availability of prospective injunctive relief. In addition, the court granted Defendants' summary judgment motion with respect to Davis, finding that she lacked standing to pursue her claim. <u>Wooden v. Board of Regents of the Univ. Sys. of Ga.</u>, 32 F. Supp. 2d 1370 (S.D. Ga. 1999). Subsequently, on March 12, 1999, the district court entered summary judgment against the Wooden Plaintiffs on lack of standing grounds. On July 6, 1999, the district court rejected Green's cause of action, finding that he, like Davis, lacked standing to pursue his discrimination claims. 59 F. Supp. 2d at 1318-1323. In a separate order entered on that date, the court found that Tracy had not established the prerequisites needed to obtain prospective injunctive relief, and also that Tracy was only entitled to recover nominal damages.[8] The court denied as well Plaintiffs' motion for class certification.

males at the TSI stage.

[8]No party has appealed the district court's finding of liability on Tracy's claim or the district court's decision to award only nominal damages on that claim. Accordingly, we shall not review those rulings.

All of those rulings were appealed to this Court.  While the appeal was pending, the Supreme Court decided a relevant case, Texas v. Lesage, 528 U.S. 18, 120 S. Ct. 467 (1999).  In pertinent part, the Supreme Court explained that:

[W]here a plaintiff challenges a discrete governmental decision as being based on an impermissible criterion and it is undisputed that the government would have made the same decision regardless, there is no cognizable injury warranting relief under § 1983.

Of course, a plaintiff who challenges an ongoing race-conscious program and seeks forward-looking relief need not affirmatively establish that he would receive the benefit in question if race were not considered.  The relevant injury in such cases is "the inability to compete on an equal footing."  Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville, 508 U.S. 656, 666, 113 S. Ct. 2297 [] (1993).  See also Adarand Constructors, Inc. v. Pea, 515 U.S. 200, 211, 115 S. Ct. 2097 [] (1995).  But where there is no allegation of an ongoing or imminent constitutional violation to support a claim for forward-looking relief, the government's conclusive demonstration that it would have made the same decision absent the alleged discrimination precludes any finding of liability.

528 U.S. at 21, 120 S. Ct. at 468-69.  *Sua sponte*, this Court on April 14, 2000, issued a decision vacating the district court's orders.  As we explained:

Appellants brought related challenges to the University of Georgia's use of race in its admissions process and to the maintenance of historically black colleges within the state's university system.  The district court granted summary judgment to appellees on all but one claim on standing and mootness grounds.  After the appeal was filed in this case, the Supreme Court in the case of Texas v. Lesage, 528 U.S. 18, 120 S. Ct. 467 [] (1999), clarified the standing requirements for plaintiffs challenging race-based admissions policies.  It is therefore ORDERED that the judgment of the district court is

13

VACATED and the case is REMANDED to that court for further consideration in light of Lesage.

Tracy v. Board of Regents of the Univ. Sys., 208 F.3d 1313, 1313-14 (11th Cir. 2000) (per curiam).

On remand, the district court expressly considered Lesage, but eventually reinstated all of its prior rulings. The district court subsequently denied the Tracy Plaintiffs' motion for reconsideration, largely repeating the analysis set out at length in its several prior opinions.

The relevant portions of the district court's rulings may be summarized as follows. With respect to Tracy's request for prospective injunctive relief, the district court initially concluded that this request was moot because Tracy transferred to UGA in 1997 and therefore had no reason to pursue an order compelling his admission to UGA. Subsequently, after this Court's remand, the district court explained that its earlier mootness analysis was incorrect. Nevertheless, the court reinstated its prior decision on the ground that Tracy lacked standing to obtain any form of prospective relief regarding UGA's freshman admissions policy, given that Tracy would never again be subject to that policy and accordingly could not establish the prospect of imminent harm necessary for him to have standing to seek a prospective injunction.

14

With respect to Davis, the district court found that she did not suffer any injury-in-fact. It reasoned that because she was denied admission outright at the AI stage, without ever proceeding to the TSI stage, she could not establish that race was a factor in the denial of her application, and specifically could not establish that UGA's discriminatory practices made her unable to compete on an equal footing with similarly-situated non-white applicants.

With respect to Green, the court found that he lacked standing to sue on an "equal footing" theory because even though he went through the race-conscious TSI phase of UGA's admissions process, he would have been rejected regardless of whether UGA had given him racial bonus points. In the words of the district court:

> [T]he parties focus on whether Green suffered an "injury-in-fact." While they agree that UGA took the ethnic/racial status of applicants into account through its TSI computation, they disagree on whether that amounted to a constitutionally sufficient injury in Green's case. Defendants insist that, because Green's race was not a factor in the ultimate decision to deny his application, he lacks standing to challenge UGA's admission policy. Even if Green had received the .5 bonus for "non-white" ethnic status at the TSI stage, they point out, his application still would have been relegated to the final (ER) admissions stage.

> [A]lthough UGA may have affirmatively considered his race at some point in the admissions process, the unrebutted evidence shows that its final decision to reject his application was not based on race. Nor did Green reach the final stage (i.e., had his file "edge read") because of his race. . . .

15

Green argues that he nevertheless has standing because UGA's admissions process (as opposed to its denial of admission) inflicted a constitutional injury upon him. Just having his application threaded through a process which employed race-counting (at the TSI stage), he contends, is enough. . . . [The] cases require Green to show that the system prevented him from competing on an equal footing. Green fails in this regard because he has not shown that he was otherwise qualified and then had his "bid" for admission subjected to a "tainted" admissions process. . . . [He] cannot say that he was prevented, because of his race, from competing "on an equal footing" with non-whites. Accordingly, Green has not suffered an "injury-in-fact" sufficient to have standing to challenge UGA's admission policy on equal protection grounds.

59 F. Supp. 2d at 1318-21 (citations omitted).

With respect to the Wooden Plaintiffs, the court found that their alleged grievances were too attenuated to constitute the "injury-in-fact" necessary to have standing. Finally, on the issue of class certification, the district court ruled that Tracy -- the only Plaintiff found to have standing in the case -- was not an adequate class representative because his individual request for prospective injunctive relief regarding the freshman admissions policy had become moot. The court also concluded that the need for individualized analysis of class members' claims made class treatment inappropriate. The court did not separately consider the ability of Green or any other Plaintiff to serve as a class representative, apparently because the court had previously decided that those Plaintiffs lacked standing to pursue claims on their own behalf.

16

II.

There can be no dispute about the proper standard of review of the district court's orders granting Defendants' motions for summary judgment and denying class certification. We review a district court's grant of summary judgment de novo, applying the same legal standards used by the district court. See, e.g., Hilburn v. Murata Elecs. N. America, Inc., 181 F.3d 1220, 1225 (11th Cir. 1999). Summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We "view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion" and "'all reasonable doubts about the facts [are] resolved in favor of the non-movant.'" See Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999) (quoting Clemons v. Dougherty County, 684 F.2d 1365, 1368-69 (11th Cir. 1982) (citations omitted)).[9]

---

[9]Even outside of summary judgment, questions of standing are reviewed de novo. See Georgia State Conf. of NAACP Branches v. Cox, 183 F.3d 1259, 1262 (11th Cir. 1999). Defendants are plainly incorrect in their suggestion that "the predominant standard of review for this Article III 'standing' case is the 'clearly erroneous' standard of [Fed. R. Civ. P. 52(a)]." While it certainly is true that this Court generally reviews a district court's underlying factual findings only for clear error, a district court's ultimate resolution of a legal question such as standing is always reviewed de novo. See, e.g., id.; Bischoff v. Osceola County, 222 F.3d 874, 879 (11th Cir. 2000). More to the point, a district court does not make factual findings in deciding a summary judgment motion, so no question of clear error review even arises here. See Rosen v. Benzer, 996 F.2d 1527, 1530 n.2 (3d Cir. 1993) ("because summary judgment may only be granted where there is no genuine issue of material fact, any purported 'factual findings' of the [trial] court cannot be 'factual findings' as to disputed issues of fact, but rather are conclusions as a matter of law that no genuine issue of material fact exists").

17

We review orders denying class certification for abuse of discretion. See, e.g., Prado-Steiman v. Bush, 221 F.3d 1266, 1278 (11th Cir. 2000).

III.

We first address our jurisdiction over this appeal. Although Defendants state that they "believe" jurisdiction exists, they nevertheless suggest that some or all of the Plaintiffs may have filed untimely notices of appeal. We must consider our jurisdiction regardless of whether any objection is raised by the parties. See, e.g., Rembert v. Apfel, 213 F.3d 1331, 1333-34 (11th Cir. 2000) ("As a federal court of limited jurisdiction, we must inquire into our subject matter jurisdiction *sua sponte* even if the parties have not challenged it."); University of S. Ala. v. American Tobacco Co., 168 F.3d 405, 410 (11th Cir. 1999) (jurisdiction "cannot be waived or otherwise conferred upon the court by the parties"). Upon doing so in this case, we conclude that although we have jurisdiction over the appeal of the Tracy Plaintiffs, we lack jurisdiction with respect to the Wooden Plaintiffs.

The district court, as noted above, entered its order on remand on June 16, 2000. That order reinstated the district court's prior, vacated decisions and again granted summary judgment to the Defendants on the claims now at issue. On June 30, 2000, the Tracy Plaintiffs moved for reconsideration; the Wooden Plaintiffs, notably, did not so move and did not join in the Tracy Plaintiffs' motion. The

18

district court denied the reconsideration motion on July 24, 2000, and a notice of appeal on behalf of both sets of Plaintiffs was filed on August 17, 2000 -- less than 30 days after the denial of reconsideration, but over two months after the June 16 order entering summary judgment.

For a notice of appeal to be timely in a civil case where the United States is not a party, it must be filed within 30 days of the judgment or order appealed from. Fed. R. App. P. 4(a)(1). Absent the filing of a timely notice, this Court does not have jurisdiction over the appeal. See, e.g., Burnam v. Amoco Container Co., 738 F.2d 1230, 1231 (11th Cir. 1984). Rule 4(a)(4), however, provides that the time for filing a notice of appeal is tolled by the filing with the district court of a timely motion to alter or amend judgment under Fed. R. Civ. P. 59. See, e.g., Great American Ins. Co. v. Rush, 670 F.2d 995, 996 (11th Cir. 1982). Consequently, a notice of appeal filed within 30 days of the disposition of the Rule 59 motion is timely. See id.

Defendants suggest, but do not argue affirmatively, that the Tracy Plaintiffs' reconsideration motion did not extend the time for filing a notice of appeal because it never referred specifically to Fed. R. Civ. P. 59. We have explained, however, that "[w]hether a motion for post-judgment relief can be categorized as a motion under Rule 59 is not determined by whether the movant so labels it. Rather, the

19

court must determine independently what type of motion was before the district court, depending upon the type of relief requested." Wright v. Preferred Research, Inc., 891 F.2d 886, 888 (11th Cir. 1990). Moreover, "Rule 59 applies to motions for reconsideration of matters encompassed in a decision on the merits of a dispute." Id. The Tracy Plaintiffs' motion directly challenged the district court's June 16 order and fits within any fair conception of a reconsideration motion. Accordingly, the Tracy Plaintiffs' notice of appeal was timely because it was filed within 30 days of the denial of their motion for reconsideration.

The Wooden Plaintiffs are in a different posture. They did not join in the reconsideration motion, and thus were required to -- but did not -- file a notice of appeal with respect to the dismissal of their claims within 30 days of the June 16 order. Both the docket sheet and the pleadings themselves indicate that only the Tracy Plaintiffs moved for reconsideration. The first line of the motion reads:

> COMES NOW the Plaintiffs ASHLEY DAVIS (Davis), KIRBY TRACY (Tracy) and CRAIG GREEN (Green) [collectively the UGA Plaintiffs] and respectfully request that the Court reconsider its June 16, 2000 Order . . .

In a footnote, the Tracy Plaintiffs explained that the Wooden Plaintiffs had no part in the motion for reconsideration.[10] The footnote reads:

---

[10]Moreover, the memorandum in support of the motion for reconsideration focuses only on the claims of the Tracy Plaintiffs. It discusses in detail the need for reconsideration with respect to Tracy, Davis, and Green, but makes no mention of the other Plaintiffs. The district

20

> The remaining <u>Wooden</u> plaintiffs who challenge defendants'
> continued maintenance of racially segregated "historically black"
> universities will file a separate motion and brief seeking consideration
> of their standing, and take no part in this motion.

A review of the docket sheet and the record reveals that the Wooden Plaintiffs never filed any motion or brief seeking reconsideration of the June 16 order.

Plaintiffs do not suggest, nor could they, that the Tracy Plaintiffs' motion by definition encompassed the Wooden Plaintiffs. Not only did the motion state specifically that the Wooden Plaintiffs would be moving separately, the claims of the two groups of Plaintiffs were litigated on an individual basis and are analytically distinct.[11] At least in this context, the filing of a joint notice of appeal from a final order resolving a group of individual claims does not relieve each plaintiff of his obligation to file a timely notice of appeal with respect to his own particular claim; the fact that the notice may be timely for some other plaintiff is immaterial. <u>See</u> <u>United States v. One Remington 12 Gauge Shotgun</u>, 709 F.2d 1468, 1469 (11th Cir. 1983) (dismissing appeal where party failed to file timely notice because "[t]he filing of a timely notice of appeal is essential to give this

---

court's order denying reconsideration likewise contains no discussion of the Wooden Plaintiffs' standing.

[11]As explained above, the Tracy Plaintiffs challenge the freshman admissions policies at UGA. The Wooden Plaintiffs do not challenge those policies, but rather challenge the Defendants' alleged perpetuation of the "segregated" HBIs.

21

court jurisdiction"); Reynolds v. Hunt Oil Co., 643 F.2d 1042, 1042 (5th Cir. Unit B 1981) (dismissing appeal and observing that "[c]ompliance with [the 30-day] requirement is a prerequisite for appellate jurisdiction"). Inadvert or not, the Wooden Plaintiffs did not move for reconsideration, and therefore were not entitled to an automatic extension of the otherwise applicable 30-day deadline for filing a notice of appeal regarding the dismissal of their claims. The appeals of Wooden, Jarvis, and Bratcher must be dismissed for lack of jurisdiction, and accordingly we do not consider their arguments on the merits.

IV.

The appeals of the Tracy Plaintiffs arise out of the district court's rulings dismissing their claims for lack of standing. Article III of the United States Constitution restricts the power of federal courts to adjudicating actual "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. "This case-or-controversy doctrine fundamentally limits the power of federal courts in our system of government, and helps to identify those disputes which are appropriately resolved through judicial process." Cox, 183 F.3d at 1262 (internal quotation marks omitted) (citing Allen v. Wright, 468 U.S. 737, 750, 104 S. Ct. 3315, 3324 (1984), and Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S. Ct. 1717, 1722 (1990)).

Perhaps the most important of the Article III doctrines grounded in the case-or-controversy requirement is that of standing. See Allen, 468 U.S. at 750, 104 S. Ct. at 3324. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197, 2205 (1975). A plaintiff seeking to invoke a federal court's jurisdiction must demonstrate three things to establish standing under Article III.[12] First, he must show that he has suffered an "injury-in-fact." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992); Cox, 183 F.3d at 1262. Specifically, the asserted injury must arise out of the invasion of a legally protected interest that is sufficiently concrete and particularized rather than abstract and indefinite. See Lujan, 504 U.S. at 560, 112 S. Ct. at 2136; see also FEC v. Akins, 524 U.S. 11, 22-24, 118 S. Ct. 1777, 1785-86 (1998). Second, the plaintiff must show a causal connection between the asserted injury-in-fact and the challenged action of the defendant. Lujan, 504 U.S. at 560, 112 S. Ct. at 2136; Allen, 468 U.S. at 751, 104 S. Ct. at 3324. That causal connection cannot be too attenuated. See id. Third, the plaintiff must show that it is likely rather than speculative that "the injury will be redressed by a favorable

---

[12]In this case we discuss the elements of so-called "constitutional" standing. Even where constitutional standing exists, prudential considerations may themselves preclude standing. See, e.g., Planned Parenthood Ass'n of Atlanta Area, Inc. v. Miller, 934 F.2d 1462, 1465 n.2 (11th Cir. 1991).

23

decision." Lujan, 504 U.S. at 561, 112 S. Ct. at 2136 (citations and internal quotations omitted). See also Miccosukee Tribe of Indians v. Florida State Athletic Comm'n, 226 F.3d 1226, 1228 (11th Cir. 2000) (setting forth the three-part test for constitutional standing).

These three elements are the "'irreducible minimum' required by the Constitution" for a plaintiff to proceed in federal court. Jacksonville, 508 U.S. at 664, 113 S. Ct. at 2302 (quoting Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S. Ct. 752, 758 (1982)). "In determining whether a plaintiff has established standing, we keep in mind the Art[icle] III notion that federal courts may exercise power only in the last resort, and as a necessity, and when the dispute is one traditionally thought to be capable of resolution through the judicial process." Cox, 183 F.3d at 1262-63 (internal quotation marks omitted) (citing Allen, 468 U.S. at 752, 104 S. Ct. at 3325).

## A.

The Tracy Plaintiffs' arguments for standing draw heavily on the Supreme Court's recent opinion in Lesage. To understand Lesage, however, it is essential to examine earlier Supreme Court decisions discussing standing in connection with a party's challenge to a competitive state-sponsored selection process that allegedly

24

discriminates based on race.  The Court in <u>Lesage</u> relied upon those decisions, and

we think it is those decisions -- rather than merely <u>Lesage</u> -- that ultimately answer

the questions now before us.

The first of those decisions is <u>Northeastern Florida Chapter, Associated</u>

<u>General Contractors of America v. City of Jacksonville</u>, 508 U.S. 656, 113 S. Ct.

2297 (1993).  That case involved a challenge to a municipal ordinance which

effectively set aside a portion of all city contracts for bidding only by minority-

owned firms.  The plaintiff was an association which included many non-minority

firms that bid regularly on city contracts, but were barred from bidding on the

set-aside contracts.  The city argued that the plaintiff lacked standing because it

failed to show that any of its members would have bid successfully on any of the

contracts as to which they were precluded from bidding.  The Supreme Court

rejected that argument, emphasizing that it was immaterial for standing purposes

whether any of the non-minority firms would have obtained the contracts were it

not for the city's discrimination:

> When the government erects a barrier that makes it more difficult for
> members of one group to obtain a benefit than it is for members of
> another group, a member of the former group seeking to challenge the
> barrier need not allege that he would have obtained the benefit but for
> the barrier in order to establish standing.  The "injury in fact" in an
> equal protection case of this variety is the denial of equal treatment
> resulting from the imposition of the barrier, not the ultimate inability
> to obtain the benefit.  <u>See, e.g.</u>, <u>Turner v. Fouche</u>, [396 U.S. 346, 362,

90 S. Ct. 532, 541 (1970)] ("We may assume that the [plaintiffs] have no right to be appointed to the . . . board of education. But [they] do have a federal constitutional right to be underlined considered for public service without the burden of invidiously discriminatory disqualifications") (footnote omitted) (emphasis added). And in the context of a challenge to a set-aside program, the "injury in fact" is the inability to compete on an equal footing in the bidding process, not the loss of a contract. . . . To establish standing, therefore, a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis.

508 U.S. at 666, 113 S. Ct. at 2303. Having defined the relevant "injury-in-fact" as "the inability to compete on an equal footing," the Court explained that it "follows from our definition . . . that petitioner has sufficiently alleged both that the city's ordinance is the 'cause' of its injury and that a judicial decree directing the city to discontinue its program would 'redress' the injury." Id. at 666 n.5, 113 S. Ct. at 2303 n.5.

In support of its holding in Jacksonville, the Supreme Court cited its "analogous" earlier decision in Regents of University of California v. Bakke, 438 U.S. 265, 98 S. Ct. 2733 (1978). In Bakke, an unsuccessful white applicant to a state medical school claimed that the school's admissions program, which reserved 16 of 100 places in the entering class for minority applicants, was inconsistent with the Equal Protection Clause. Addressing the argument that the applicant lacked standing to challenge the admissions program, Justice Powell (in a portion of his

26

opinion joined by a majority of the Court) concluded that the "constitutional requirements of Art[icle] III" had been satisfied because the requisite "injury" was the school's "decision not to permit Bakke to compete for all 100 places in the class, simply because of his race." Id. at 281 n.14, 98 S. Ct. at 2743 n.14. Thus, "even if Bakke had been unable to prove that he would have been admitted in the absence of the special program, it would not follow that he lacked standing." Id.

Subsequent to Jacksonville, the Court decided Adarand Constructors, Inc. v. Pea, 515 U.S. 200, 115 S. Ct. 2097 (1995). Adarand, like Jacksonville, arose out of a contract bidding process. The plaintiff, a non-minority subcontracting firm, was the low bidder for a subcontracting job on a federal highway project. The job was awarded to a minority-owned firm, however, because a federal law effectively awarded financial incentives to general contractors hiring minority subcontractors. The defendant argued that the plaintiff lacked standing to seek prospective injunctive relief. The Court rejected that argument, and in so doing, also rejected the notion that the plaintiff was required to show it was likely to be the low bidder on future government contracts and hence likely to be awarded future contracts absent the discriminatory incentive system:

> Adarand's claim that the Government's use of subcontractor compensation clauses denies it equal protection of the laws of course alleges an invasion of a legally protected interest, and it does so in a

27

manner that is "particularized" as to Adarand. We note that, contrary to respondents' suggestion, [] Adarand need not demonstrate that it has been, or will be, the low bidder on a Government contract. The injury in cases of this kind is that a "discriminatory classification prevent[s] the plaintiff from competing on an equal footing." The aggrieved party "need not allege that he would have obtained the benefit but for the barrier in order to establish standing."

515 U.S. at 210, 115 S. Ct. at 2104-05 (quoting Jacksonville, 508 U.S. at 667, 113 S. Ct. at 2304).

Adarand plainly reinforced the principle adopted in Jacksonville and Bakke: when a plaintiff competing for a government-sponsored benefit has been treated differently because of race, he has standing to challenge that differential treatment because his application has not been considered "on an equal footing" with applications from members of the favored racial group. This Court, in standing-related opinions subsequent to Jacksonville and Adarand, has likewise focused on the injury caused by direct exposure to unequal treatment, without regard to whether the plaintiff ultimately may obtain the sought-after benefit. In Cone Corp. v. Hillsborough County, 5 F.3d 1397 (11th Cir. 1993) (per curiam), for example, we explained that when an affirmative action plan subjects the plaintiff to "competition on an uneven playing field, . . . [s]uch unequal competition . . . can cause harm whether or not those forced to compete on less advantageous terms gain the benefit sought." Id. at 1398 (citing Jacksonville). Similarly, in

28

Engineering Contractors Association of South Florida, Inc. v. Metropolitan Dade County, 122 F.3d 895 (11th Cir. 1994), we reasoned that where bidders for county construction contracts "do not compete on an equal basis," that alone gives them standing to challenge the provisions causing the unequal treatment. Id. at 906 (citing Jacksonville).

We come, then, to the Supreme Court's recent decision in Lesage. In that case, a white plaintiff named Lesage brought an action under § 1983 for money damages and prospective injunctive relief after unsuccessfully applying to a Ph.D. program at the University of Texas. The university admitted that race was a factor at some stages of the admissions process (although the record did not establish whether Lesage's application ever reached one of those stages). The district court granted summary judgment to the university, on the ground that Lesage would have been denied admission even if race had not been a factor in the admissions process. Reversing the district court, the Fifth Circuit held that Lesage's chances under a color-blind admissions scheme were irrelevant because, if Lesage could prove that his application was treated differently because of race, then he would be entitled to prevail on the merits under the logic of the "equal footing" standing cases.

29

The Supreme Court reversed the Fifth Circuit, holding that "[i]nsofar as the Court of Appeals held that summary judgment was inappropriate on Lesage's § 1983 action seeking damages for the school's rejection of his application . . . even if petitioners conclusively established that Lesage would have been rejected under a race-neutral policy, its decision is inconsistent with this Court's well-established framework for analyzing such claims." 528 U.S. at 20, 120 S. Ct. at 467. The crux of the Court's concern was the Fifth Circuit's failure to take sufficient account of the merits defense created by Mt. Healthy City Board of Education v. Doyle, 429 U.S. 274, 97 S. Ct. 568 (1977), and its progeny. Under Mt. Healthy, explained the Court, "even if the government has considered an impermissible criterion in making a decision adverse to the plaintiff, it can nonetheless defeat liability by demonstrating that it would have made the same decision absent the forbidden consideration. . . . Simply put, where a plaintiff challenges a discrete governmental decision as being based on an impermissible criterion and it is undisputed that the government would have made the same decision regardless, there is no cognizable injury warranting relief under § 1983." Lesage, 528 U.S. at 20-21, 120 S. Ct. at

30

468 (citing <u>Mt Healthy</u>).[13]  The Court found that, on remand, the university should be permitted to seek summary judgment on this basis.

The Court went on, however, to distinguish between the requisite injury for seeking damages and that necessary to seek prospective injunctive relief.  In the course of that discussion, the Court referred to its earlier standing-related decisions defining the relevant injury in cases challenging an affirmative action policy:

> Of course, a plaintiff who challenges an ongoing race-conscious program and seeks forward-looking relief need not affirmatively establish that he would receive the benefit in question if race were not considered.  The relevant injury in such cases is "the inability to compete on an equal footing."  <u>Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville</u>, 508 U.S. 656, 666, 113 S. Ct. 2297, 124 L. Ed. 2d 586 (1993).  <u>See also</u> <u>Adarand Constructors, Inc. v. Pena</u>, 515 U.S. 200, 211, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995).  But where there is no allegation of an ongoing or imminent constitutional violation to support a claim for forward-looking relief, the government's conclusive demonstration that it would have made the same decision absent the alleged discrimination precludes any finding of liability.

---

[13]In <u>Mt. Healthy</u>, the Court held that a school board which fired a teacher for engaging in protected expression, among other reasons, could escape liability under § 1983 by showing that it would have fired the teacher anyway without regard to the protected expression.  <u>See</u> 429 U.S. at 287, 97 S. Ct. at 576.  Thus, "[w]here a plaintiff challenges a discrete governmental decision as being based on an impermissible criterion and it is undisputed that the government would have made the same decision regardless, there is no cognizable injury warranting relief under § 1983."  <u>Lesage</u>, 528 U.S. at 21, 120 S. Ct. at 468.  In <u>Lesage</u>, the Court held that the <u>Mt. Healthy</u> defense applies in Equal Protection race discrimination cases under § 1983 as well as First Amendment cases.  <u>Id.</u> ("Our previous decisions on this point have typically involved alleged retaliation for protected First Amendment activity rather than racial discrimination, but that distinction is immaterial.  The underlying principle is the same:  The government can avoid liability by proving that it would have made the same decision without the impermissible motive.").

31

Lesage, 528 U.S. at 21, 120 S. Ct. at 468-69.  The court went on to remand

Lesage's claim for prospective injunctive relief, because it could not determine

whether that claim had been abandoned.

As Defendants observe, Lesage does not specifically address standing

(indeed, the opinion does not refer to standing at all).  Nevertheless, we agree with

our decision vacating the district court's original judgment, in which we described

Lesage as "clarif[ying] the standing requirements for plaintiffs challenging

race-based admissions policies."  208 F.3d at 1313-14.  Whether or not the opinion

expressly discusses standing, it plainly bears on that inquiry because it further

defines the kind of injury that would support relief in a case challenging the

process of awarding benefits under a government affirmative action plan.  "Injury-

in-fact" is the touchstone of standing, see, e.g., Lujan, 504 U.S. at 560, 112 S. Ct.

at 2136, and it is to Supreme Court decisions such as Lesage that we must look in

defining the relevant injury in these types of cases.[14]

The difficulty, of course, is determining the scope of the Court's statement --

first made in Jacksonville, reiterated in Adarand, and repeated most recently in

_____

[14]Lesage is also notable because it applies in a university admissions case the "equal footing" principle developed primarily in government contract cases.  In both types of cases, the plaintiff is competing against others for a benefit conferred on some, but not all, by the state. After Lesage, Jacksonville and Adarand are not distinguishable simply because they involve the process of awarding government contracts.

32

Lesage -- that "[t]he relevant injury . . . is 'the inability to compete on an equal footing.'" Lesage, 528 U.S. at 21, 120 S. Ct. at 468-69 (quoting Jacksonville). In the context of this case, and holding aside the additional considerations raised by a claim for prospective injunctive relief, see infra Part IV.D, there are at least three possible interpretations. As the Tracy Plaintiffs see it, it is enough to allege that at some stage in the UGA freshman admissions process a white applicant will be disadvantaged because of race. In other words, viewing the admissions process as a whole, white applicants do not compete on an equal footing with non-white applicants, and that fact alone creates an injury sufficient to confer standing on all unsuccessful white applicants. It follows, Plaintiffs say, that mere participation in the race-conscious admissions process is enough to establish injury, regardless of whether the applicant would have been knocked out under race-neutral criteria before or after the particular stage of the admissions process where race was considered.

Defendants, unsurprisingly, take a different view. As they see it, for a white applicant to claim that he has been denied an opportunity to compete on an equal footing with non-white applicants, he necessarily must show that he is, in fact, able to compete equally. The upshot of this position is that regardless of whether a candidate's application was treated less favorably because of his race, if the

33

candidate is unable to show that the fate of his application was altered due to race, then he would not be able to show that he was in a position to compete equally and therefore would lack standing. Consequently, not only is mere participation in a race-conscious admissions program insufficient to confer standing, actual dissimilar treatment of an application at some stage of the process is not enough unless the candidate could show that he was knocked out because of race.

A third view would strike a middle ground between the conflicting positions of the parties. According to that view, the critical inquiry for standing purposes would be whether the plaintiff's application has <u>actually</u> been treated differently at some stage in the admissions process on the basis on race. If so, then the plaintiff has not competed on an equal footing with other applicants outside his racial classification, and standing should be conferred regardless of whether race is ultimately a factor in the decision to reject the application. Conversely, if the plaintiff's application is never actually treated differently because of race, then the fact that race may be a consideration in assessing other applicants at a different stage of the process should not by itself confer standing. As discussed below, it is this approach which we find most consonant with binding Supreme Court precedent.

B.

We think Green's standing presents the most difficult question in the appeal. It is undisputed that UGA's post-1995 freshman admissions policy made race a factor in evaluating applicants. It is also established, on this record, that race was a factor only at the TSI stage, and was not an express consideration at the initial AI stage or the final ER stage.[15] Drawing on that distinction, Defendants insist that Green was not injured by UGA's consideration of race as a factor under the 1997 version of the admissions policy because (1) his application would have proceeded to the ER stage regardless of whether he received the 0.5 point bonus given to similarly-situated non-white applicants (i.e., he would not have been admitted automatically at the TSI stage even if he received the bonus); (2) scores from the TSI stage did not carry over to the ER stage; and (3) race was not a factor at the ER stage (the stage at which he was denied admission). Plaintiffs respond that Green's claim fits squarely under Jacksonville: at the TSI stage he was plainly not "on an equal footing" with non-white applicants because those applicants received a bonus that he did not. Defendants counter that even so, Green was not tangibly injured

---

[15]Green contends that race is indeed a factor, although an unstated one, at the subjective ER stage. The district court rejected Green's argument in denying his motion for reconsideration. According to Defendants, there is no evidence in the record that race was a permissible factor, or was in practice a factor, in the ER process during the year that Green's application was considered. Because we find that Green has standing regardless of whether race was considered in the examination of his application during the ER stage, we do not resolve that debate, and leave the issue for further development (if appropriate) on remand.

by any "unequal" treatment because he was rejected at a stage of the process which did <u>not</u> consider race.

We think Defendants take too narrow a view of the significance of UGA's decision to consider race at the TSI stage.  As set forth above, the Supreme Court has explained repeatedly that "[t]he 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."  <u>Jacksonville</u>, 508 U.S. at 666, 113 S. Ct. at 2303.  The Court's decisions establish that when an applicant competing for a government benefit has been exposed to unequal treatment, it is the exposure to unequal treatment which constitutes the injury-in-fact giving rise to standing.  <u>See</u> <u>Adarand</u>, 515 U.S. at 211, 115 S. Ct. at 2104-05 ("The injury in cases of this kind is that a 'discriminatory classification prevent[s] the plaintiff from competing on an equal footing.'") (quoting <u>Jacksonville</u>).  In this case, the undisputed record shows that Green's application was denied equal treatment at the TSI stage -- he did not receive the 0.5 bonus awarded to non-white candidates.  He therefore was not allowed to compete on an equal footing with non-white candidates at the TSI stage.

Defendants' argument fails to take account of the fit between Green's allegations and the Supreme Court's definition of injury in cases such as

36

Jacksonville.  It may well be true that Green's ultimate fate in the UGA admissions process would not have been altered even if he had received the 0.5 point bonus or alternatively if non-white candidates had been denied such a bonus.  In either instance, he would have fallen into the middle group of candidates who were neither accepted nor rejected at the TSI stage, and instead were passed on to the ER stage.  But the Supreme Court's standing jurisprudence in this area unmistakably turns the focus away from that kind of result-oriented analysis and toward a process-oriented analysis that asks whether the plaintiff has actually been exposed to unequal treatment.  Here, there is simply no question that Green's application was treated differently, and less favorably, than the applications of non-white candidates solely because of race.  That is enough to give him standing to challenge the policy.

The fact that Green's application was subsequently rejected under race-neutral criteria at the ER stage does not support the proposition that Green was not qualified to compete on equal terms with non-white applicants at the TSI stage. Moreover, the fact that Green was eventually rejected under race-neutral criteria does not mean that he suffered no cognizable injury from the unequal treatment.

To reiterate, the injury in these kinds of cases is not the denial of the sought-after benefit, but rather the direct exposure to unequal treatment.  See, e.g., Lesage,

528 U.S. at 21, 120 S. Ct. at 468-69 ("[t]he relevant injury . . . is 'the inability to compete on an equal footing.'") (quoting <u>Jacksonville</u>); <u>Adarand</u>, 515 U.S. at 211, 115 S. Ct. at 2104-05 ("The aggrieved party 'need not allege that he would have obtained the benefit but for the barrier in order to establish standing.'") (quoting <u>Jacksonville</u>); <u>Jacksonville</u>, 508 U.S. at 666, 113 S. Ct. at 2303 ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit. And in the context of a challenge to a set-aside program, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract.") (citation omitted); <u>Cone</u>, 5 F.3d at 1398 (inability to compete on even playing field "can cause harm whether or not those forced to compete on less advantageous terms gain the benefit sought."). The concern raised by Defendants therefore goes less to standing than it does to Green's ability to succeed on the merits of his claim. A showing that Green was denied admission under race-neutral criteria, and that his application would have been handled in exactly the same way even if race were not a factor at the TSI stage, may well defeat Green's claim or establish a <u>Mt. Healthy</u> defense. But at least in this context the Supreme Court has chosen to define the relevant injury-in-fact without regard to the end result of the defendant's consideration of race.

38

A finding that plaintiff has standing simply means that the plaintiff is entitled to "walk through the courthouse door" and raise his grievance before a federal court; it is a threshold determination that is conceptually distinct from whether the plaintiff is entitled to prevail on the merits. Standing doctrine has been developed primarily to ensure that the person seeking to litigate a claim is the "right" person to advance the claim. "The requirement that a party seeking review must allege facts showing that he is himself adversely affected [is] at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome." Sierra Club v. Morton, 405 U.S. 727, 740, 92 S. Ct. 1361, 1368-69 (1972). Especially in this area, we cannot read the Court's jurisprudence as conflating the standing inquiry with resolution of the merits of the plaintiff's attack on race-conscious governmental decision-making. Defendants' argument that Green suffered no "injury-in-fact" is unconvincing because, at bottom, it conceives of the standing inquiry as duplicating an inquiry into the merits.[16]

_____

[16]Although some overlap may be inevitable, standing doctrine was not intended to provide a vehicle for resolution at the threshold of fundamentally merits issues. As the Supreme Court has explained, standing is designed to insure that the judicial process is not transformed into "no more than a vehicle for the vindication of the value interests of concerned bystanders." United States v. SCRAP, 412 U.S. 669, 687, 93 S. Ct. 2405, 2416 (1973). Green is plainly not such a plaintiff.

39

Our determination that Green has suffered an injury-in-fact based on his exposure to unequal treatment at the TSI stage of the admissions process does not, of course, wholly end the standing analysis. To establish standing, a plaintiff must also show that the defendants caused the asserted injury and that a favorable decision would be likely to redress that injury. Defendants assert that Green cannot make such a showing because even if Green were to prove that UGA acted unlawfully by considering race in the admissions process, that determination would not yield any relief for him because he was rejected under race-neutral criteria and would not have been admitted even if race were excluded as a factor. But once again, this argument conflates the merits of the case, and particularly the Mt. Healthy defense, with standing. To the extent the injury here is the undisputed fact that Green's application was treated differently and less favorably because of his race (not the ultimate denial of admission), that injury was unquestionably caused by Defendants and their deliberate use of race as a factor in the admissions process. Moreover, a court could redress that injury by, among other things, declaring that Green's application must be re-considered under an entirely race-neutral admissions process. Although it is possible that the outcome of that process would be exactly the same as it was under the race-conscious process actually applied to

Green's application, such a determination cannot be made now under the rubric of standing.

For the foregoing reasons, the district court erred by rejecting Green's claim on the single ground that he lacked standing. In the end, this Court simply cannot square Defendants' logic with the concept of injury-in-fact adopted by the Supreme Court, which has recognized that the injury caused by a race-conscious admissions or bidding process is the fact of unequal treatment, without regard to whether race ultimately costs the plaintiff the desired benefit. This is not to say that Green must, or should, prevail on his cause of action. Defendants may well be correct that Green would not have been admitted to UGA even if race were not a factor, and may eventually defeat Green's claim on that basis or on other grounds. We offer no opinion at this time on Green's likelihood of success, or the remedies he may or may not obtain if indeed he were to prevail. We simply hold that Green established standing to pursue a claim on the merits, and therefore reverse the district court's entry of summary judgment against him on that basis.[17]

_____

[17]The district court did not discuss separately Green's standing to seek prospective injunctive relief in the form of an injunction forbidding the use of race as a factor in the UGA freshman admissions process. It is unclear whether Green desires such relief or can establish the additional elements necessary to have standing to seek such relief. See infra Part IV.D. We note, however, that a request for prospective relief may proceed differently than a request for retrospective relief (such as damages or an order awarding the sought-after benefit) based on a completed, past act of discrimination. Among other things, as Lesage reinforces, a successful Mt. Healthy defense will not necessarily preclude a finding of liability for the purpose of

41

C.

We next address the standing of Plaintiff Davis. Davis, as noted above, was rejected during the initial IA phase of the admissions process, which focused solely on race-neutral objective criteria and took place before any race- or ethnicity-based considerations entered the picture for those proceeding to the TSI stage under the applicable 1996 version of the policy. Davis's academic index fell below the minimum required to advance to the TSI stage -- let alone to be admitted automatically -- and hence she was rejected on that basis. Simply put, at the only stage during which Davis's application was considered by UGA, she was plainly on an equal footing with all other applicants, and was deemed unqualified according to entirely race-neutral criteria.[18] Hence, Davis cannot claim to have suffered any cognizable injury on account of race unless we were to find that the injury here is exposure to an overall admissions process that includes a race-or ethnicity-based component to which the plaintiff herself is not actually subject.

---

awarding prospective relief to redress ongoing or likely future injury to the plaintiff. See Lesage, 528 U.S. at 21, 120 S. Ct. at 468, 469; Thigpen v. Bibb County, 223 F.3d 1231, 1241-42 (11th Cir. 2000) (although "same decision" defense originating in Mt. Healthy "is permitted in a section 1983 equal protection suit, it obviates completely a defendant's liability only where a plaintiff seeks relief for a prior instance of discrimination") (citation omitted). That said, we express no opinion at this time on Green's entitlement, if any, to prospective relief.

[18]Davis is therefore in an entirely different posture than Green, whose application was actually given unequal treatment in the admissions process. As discussed above, that fact is critical to the evaluation of Green's standing.

We find no support for that strained argument in the Supreme Court's jurisprudence. Plaintiffs' position would virtually abolish the injury-in-fact requirement in this context, conferring a cognizable injury on every unsuccessful applicant for a government contract or admission to a public university where the process at some stage or for some purposes disfavors the applicant's racial group in favor of another, regardless of whether the plaintiff herself was actually treated unequally. The law does not go that far. In Jacksonville, Bakke, and Adarand, the plaintiffs were exposed to race-conscious criteria at the very first step of the selection process, either in the form of a fixed, race-based constraint on eligibility for the benefit (Jacksonville, Bakke) or a race-based incentive system that adversely affected their position relative to other candidates seeking the benefit (Adarand). At no point were the bids or applications of the plaintiffs in those cases either considered without regard to race or unaffected by race-based limitations. Accordingly, we cannot draw from these cases the proposition that merely being exposed to an admissions process which considers race at some but not all stages necessarily creates standing for all applicants who would have been ineligible for special treatment had they proceeded to the race-conscious stage of the process. Nor does Lesage even remotely suggest that conclusion.

Our decision in Cone further demonstrates the flaws in Davis's argument. That case involved a challenge brought by general contractors who alleged that a county affirmative action plan governing the award and implementation of public construction contracts impermissibly discriminated against non-minority firms. Most of the specific provisions challenged did not cause the plaintiffs any cognizable injury. Only one provision in the county's plan treated minority and non-minority general contractors differently; as to that single provision, we remanded to the district court to consider whether the plaintiffs suffered any injury as a result of it. 5 F.3d at 1399. Notably, however, we did not suggest that, if the plaintiffs had standing to challenge the one facially-discriminatory provision, they would thereby have standing to challenge the other provisions as well; on the contrary, we dismissed the plaintiffs' challenge to the other provisions for lack of standing. Id. at 1398 (affirming the dismissal of "all claims dealing with provisions of the affirmative action program which treat minority and non-minority general contractors alike, because they do not produce competition on an uneven playing field"). In short, the plaintiffs could not use their potential exposure to discrimination pursuant to one provision of the county's plan as a vehicle to assert standing for purpose of challenging other aspects of the plan that did not cause them cognizable injury.

Davis's argument is even less compelling than the logic we rejected in Cone. She contends that she has standing to challenge UGA's admissions policy solely by virtue of the fact that one aspect of the 1996 version of the policy -- the awarding of bonus points based upon race or ethnicity at the TSI stage -- is race-conscious. But like the plaintiffs in Cone, Davis cannot challenge provisions of the policy which did not cause her cognizable injury. And because the one provision that did cause her injury (the AI process) is undisputedly race-neutral, she cannot prove standing to assert a claim of race discrimination.

We therefore agree with the district court that a white applicant knocked out at the first stage of the UGA admissions process based on purely race-neutral criteria -- as part of an entirely race-neutral inquiry into objective qualifications -- cannot claim to have been denied an opportunity to compete "on an equal footing" with non-white applicants. Davis was not exposed to any unequal treatment, and her application was never actually disadvantaged because of her race. It follows that Davis has failed to prove an injury-in-fact, and therefore necessarily fails to establish the other elements of constitutional standing. Accordingly, we conclude

that the district court properly granted summary judgment on standing grounds with respect to Plaintiff Davis.[19]

### D.

For different reasons, the district court also did not err in rejecting Tracy's claim for prospective injunctive relief. Simply because a party prevails on the merits of a constitutional claim does not mean that the party is automatically entitled to prospective injunctive relief. Rather, to have standing to obtain forward-looking relief, a plaintiff must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future.[20] We discussed this requirement and the seminal Supreme Court opinion of City of Los Angeles v.

---

[19]Contrary to Plaintiffs' argument, the fact that Green has standing to advance his claim does not mean that Davis -- who presents a materially distinct claim -- is relieved from her burden of proving individual standing. Compare American Iron & Steel Institute v. OSHA, 182 F.3d 1261, 1274 n.10 (11th Cir. 1999) (declining to inquire into standing of one group of plaintiffs where a second group concededly had standing and both groups raised the identical challenge which did not turn on any factual differences between the two groups).

[20]Tracy's uncontested standing to seek retrospective relief based on the denial of his admission to UGA as part of the Fall 1995 class does not by itself give him standing to seek prospective injunctive relief. See Bowen v. First Family Fin. Servs., Inc., 233 F.3d 1331, 1340 (11th Cir. 2000) ("'[a] party with standing to advance one claim may lack standing to advance other claims'"); see also International Primate Protection League v. Administrators of Tulane Educ. Fund, 500 U.S. 72, 77, 111 S. Ct. 1700, 1704 (1991) ("[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party presents."). Similarly, the fact that this suit was brought as a class action does not alter Tracy's obligation to show that he individually satisfies the constitutional requirements of standing. See Bowen, 233 F.3d at 1339 n.6. The possibility that Green or unnamed class members may be able to seek prospective relief, therefore, does not establish Tracy's standing to seek that relief as well.

46

Lyons, 461 U.S. 95, 103 S. Ct. 1660 (1983), in Church v. City of Huntsville, 30

F.3d 1332 (11th Cir. 1994):

> Because injunctions regulate future conduct, a party has standing to
> seek injunctive relief only if the party alleges, and ultimately proves, a
> real and immediate -- as opposed to a merely conjectural or
> hypothetical -- threat of future injury. [Lyons, 461 U.S.] at 102, 103
> S. Ct. at 1665. Logically, "a prospective remedy will provide no relief
> for an injury that is, and likely will remain, entirely in the past."
> Although "past wrongs are evidence bearing on whether there is a real
> and immediate threat of repeated injury," O'Shea v. Littleton, 414
> U.S. 488, 496, 94 S. Ct. 669, 676 [] (1974), "[p]ast exposure to illegal
> conduct does not in itself show a present case or controversy
> regarding injunctive relief . . . if unaccompanied by any continuing,
> present adverse effects." Lyons, 461 U.S. at 102, 103 S. Ct. at 1665
> (alterations in original) (quoting O'Shea, 414 U.S. at 496, 94 S. Ct. at
> 676).

In Lyons, police officers had stopped Lyons for a traffic
violation. Id. at 97, 103 S. Ct. at 1663. Although he offered no
resistance or provocation, the officers applied a chokehold that
rendered him unconscious and seriously injured him. Id. at 99, 103 S.
Ct. at 1664. Lyons sued for damages and an injunction to bar future
police use of chokeholds absent an immediate threat of deadly force.
Id. at 98, 103 S. Ct. at 1663. The district court granted a preliminary
injunction, the court of appeals affirmed, but the Supreme Court
reversed. Id. at 99-100, 103 S. Ct. at 1664. The Supreme Court
reasoned that Lyons' standing rested on the mere speculation that the
police might stop him again and that, if stopped, the arresting officers
might apply an unconstitutional chokehold. The Court concluded:

> In order to establish an actual controversy in this case,
> Lyons would have had not only to allege that he would
> have another encounter with the police but also to make
> the incredible assertion either (1) that all police officers
> in Los Angeles always choke any citizen with whom they

> happen to have an encounter, whether for the purpose of
> arrest, issuing a citation, or for questioning, or (2) that the
> City ordered or authorized police officers to act in such a
> manner.

> Id. at 105-06, 103 S. Ct. at 1667. According to the Court, there was no
> "real and immediate threat" that either of the causes of Lyons' past
> injury -- his illegal conduct that led the police to stop his vehicle and
> the ensuing police conduct -- would recur in the future. Lyons'
> standing to seek damages for his past injuries, while not questioned by
> the Court, simply did not establish that he "faced a realistic threat
> from the future application of the City's policy." Id. at 106 n.7, 103 S.
> Ct. at 1668 n.7.

30 F.3d at 1337 (citations omitted). Invoking that reasoning, this Court has often emphasized that to obtain prospective injunctive relief a plaintiff must show that he faces a substantial likelihood of injury in the future. See, e.g., Bowen, 233 F.3d at 1340 (finding that plaintiff lacked standing to seek prospective injunctive relief where he could not "allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future") (quoting Malowney v. Federal Collection Deposit Group, 193 F.3d 1342, 1346-47 (11th Cir. 1999)).

Tracy is now a student at UGA, and there is no evidence that he intends to re-apply for admission to UGA under any version of the freshman admissions policy. There is no likelihood, therefore, that he will ever again be exposed to UGA's allegedly discriminatory freshman admissions process. As Lyons makes clear, the fact that others may be exposed to that process in the future is not

48

sufficient for Tracy to obtain prospective relief that will not benefit <u>him</u> in conjunction with his individual claim.

Plaintiffs make several counter-arguments, none of which is persuasive. First, they cite case law for the proposition that a plaintiff's entitlement to injunctive relief is measured at the time the complaint is filed. <u>See</u> <u>Robidoux v. Celani</u>, 987 F.2d 931, 938 (2d Cir. 1993). They contend that at the time the complaint was filed, Tracy had not yet transferred to UGA. As Defendants observe, however, the policy by which UGA allegedly discriminated against Tracy was the 1990-95 policy, which was <u>not</u> the policy in place at the time Plaintiffs filed suit in 1997. The post-1995 policy was not the predicate of Tracy's individual claim in the complaint, and was not likely to affect Tracy at the time he filed his complaint. There is, for example, no persuasive evidence that Tracy intended to re-apply to UGA via the freshman admissions process (on the contrary, he sought admission to UGA through a different route -- the transfer process -- soon after the complaint was filed). Accordingly, Tracy would not have been entitled to prospective injunctive relief regarding the post-1995 policy at the time he filed his complaint. Moreover, any prospective relief we might award with

respect to the post-1995 policy would not redress the injury suffered by Tracy as a result of the 1990-95 policy.[21]

Second, in a related argument, Plaintiffs cite decisions setting forth the proposition that a defendant's voluntary cessation of a challenged practice does not necessarily render a case moot and thereby deprive a federal court of its power to determine the legality of the practice. See, e.g., Jacksonville, 508 U.S. at 662, 113 S. Ct. at 2301. But while the district court occasionally spoke of this issue in terms of mootness, the real obstacle here is standing. In other words, the problem is not that the Defendants rescinded the unlawful 1990-95 admissions policy after the complaint was filed (thereby creating a potential mootness issue), but rather that the original policy had been replaced before Tracy and the other Plaintiffs even

---

[21]In Robidoux, the Second Circuit explained that "[f]or a plaintiff to have standing to request injunctive or declaratory relief, the injury alleged must be capable of being redressed through injunctive relief 'at that moment.' The plaintiff may meet this standard by alleging that the defendant was engaging in the unlawful practice against the plaintiff at the time of the complaint." 987 F.2d at 938 (citing County of Riverside v. McLaughlin, 500 U.S. 44, 111 S. Ct. 1661 (1991)). The Second Circuit described McLaughlin as setting forth an alternative to Lyons for establishing standing to seek prospective relief. 987 F.2d at 938. Plaintiffs here seem to be taking a similar view and arguing for standing under McLaughlin rather than under Lyons. McLaughlin, however, concerned a situation where the plaintiffs were exposed to a continuing unconstitutional act -- a protracted delay in affording them probable cause hearings -- which was ongoing at the time of the complaint but was cured after the filing of the complaint. The Supreme Court explained that the alleged violations of the plaintiffs' constitutional rights had not been completed by the time of the complaint, and therefore the requirements set forth in Lyons did not apply. 500 U.S. at 51, 111 S. Ct. at 1667. In this case, by contrast, the alleged violation of Tracy's rights -- the denial of his application for admission as a member of UGA's Fall 1995 freshman class -- had been completed well before Plaintiffs filed their complaint.

filed suit. Tracy never had standing to challenge the revised policy, and accordingly we never reach the question of whether Tracy's challenge to that policy eventually became moot.

Third, Plaintiffs maintain that the post-1995 policy is essentially the same as the 1990-95 policy that affected Tracy, and therefore Tracy should be entitled to seek prospective relief with respect to the revised policy. This reasoning is no answer to Tracy's inability to satisfy the "likely future injury" requirement of Lyons, however. In any event, the post-1995 policy is materially different than its predecessor. Under the 1996 and 1997 versions of revised policy, race is considered at only one stage of the admissions process, and applicants are not "dual-tracked" (in the sense of being held to different objective standards) based on their race. Under the prior policy, by contrast, black and non-black applicants were treated differently and held to different standards from the very outset of the evaluation process. "[A] plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." Blum v. Yaretsky, 457 U.S. 991, 999, 107 S. Ct. 2777, 2783 (1982) (citing Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 166-167, 92 S. Ct. 1965, 1968-69 (1972)).

Fourth, Plaintiffs maintain that denying standing to Tracy is unfair because otherwise UGA's freshman admissions policy will be effectively unreviewable. They appear to believe that prospective relief could only be sought by someone who, having been rejected, is then prepared to wait out the duration of the litigation without seeking to gain admission to UGA as a transfer student. Moreover, according to Plaintiffs, even if an individual plaintiff seems likely to prove a violation, UGA can -- as it has in the past -- avoid any risk of far-reaching court-ordered prospective relief with regard to its freshman admissions policy simply by offering admission to that individual. At least on the record before us, we do not share Plaintiffs' concern. Suffice it to say that there has been no showing that the pool of potential plaintiffs able to challenge UGA's freshman admissions policy on these grounds is drying up. We also are confident that, regardless of any prospective relief a court might order, UGA would not ignore the import of a controlling federal court decision holding that its freshman admissions policy is unconstitutional. In any event, as discussed above, Tracy is not in a position to advance these concerns as a reason to grant him standing to seek prospective injunctive relief because he was not affected by the version of UGA's freshman admissions policy now in place.

Finally, Plaintiffs maintain that <u>Lesage</u> somehow entitles Tracy to prospective injunctive relief. But there is no indication in <u>Lesage</u> that the Court intended to alter the well-settled prerequisites to granting such relief. Plaintiffs' argument appears to be based on the Court's statement that "[o]f course, a plaintiff who challenges an ongoing race-conscious program and seeks forward-looking relief need not affirmatively establish that he would receive the benefit in question if race were not considered." 528 U.S. at 21, 120 S. Ct. at 468. But <u>Lesage</u> plainly does not hold that a plaintiff may obtain prospective injunctive relief merely by alleging "an ongoing or imminent constitutional violation," <u>id.</u>, arising out of a practice that has not injured him to date and is highly unlikely to injure him in the future.

Nor can <u>Lesage</u> be read to create an exception to <u>Lyons</u> where the discriminatory admissions policy is still in place. If the Supreme Court intended so significant and potentially far-reaching a change in the law of standing, surely it would have said so directly, or at least cited <u>Lyons</u>. To reiterate, standing, *qua* standing, was not even an issue in <u>Lesage</u>, and no question of prospective relief arose there because it appeared that the plaintiff had abandoned his claim that the defendant university was still administering a discriminatory admissions policy. 528 U.S. at 22, 120 S. Ct. at 469. Tracy, therefore, lacks standing to seek

53

prospective injunctive relief with respect to UGA's revised freshman admissions policy, and the district court correctly declined to grant that relief.

E.

Before closing, we address briefly the district court's denial of class certification. The crux of the district court's ruling was its finding that Tracy -- the only Plaintiff with any standing at all in the eyes of the district court -- could not represent a class of persons challenging UGA's freshman admissions policy.[22] The court explained that Tracy's own claim had become moot by virtue of his admission to UGA as a transfer student, and that additionally there were too many questions requiring individualized analysis for class treatment to be acceptable. The court did not expressly consider whether Green could represent a viable class. On appeal, Plaintiffs argue that both Tracy and Green should be permitted to serve

---

[22]Plaintiffs' class allegations were sweeping. Plaintiffs purported to represent:

[A]ll present and future students of any four-year or university-level public institution of higher education in Georgia; parents of minor students of such institutions; applicants for admission at such institutions; parents of minor applicants for admission at such institutions; faculty and administrative employees at such institutions; applicants for faculty and administrative employment at such institutions; and applicants for promotion at such institutions; who have been denied admission, employment, promotion, or monies based on their race, within the two year period preceding the filing of this complaint.

Plaintiffs' Motion for Class Certification, Dec. 1, 1997, at 1. The district court appears to have considered Plaintiffs' motion only from the standpoint of whether Tracy could represent a class of persons challenging UGA's freshman admissions policy.

54

as class representatives, and that the class issue should be revisited with that point established.

The general principles regarding class certification are well-settled.[23] Among other things, as a prerequisite to certification, it must be established that the proposed class representatives have standing to pursue the claims as to which classwide relief is sought. The standing requirement is a function not only of Article III, but also the requirement in the class action rule -- Fed. R. Civ. P. 23 -- that the representative's individual claim be typical of those belonging to the class members he seeks to represent. See Fed. R. Civ. P. 23(a)(3) ("the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class"). As we have explained:

> It should be obvious that there cannot be adequate typicality between a class and a named representative unless the named representative has individual standing to raise the legal claims of the class. . . . [T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large. Without individual standing to raise a legal claim, a named representative does not have the requisite typicality to raise the same claim on behalf of a class. As the Supreme Court has explained, "[w]e have repeatedly held that a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." [General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 156, 102 S. Ct. 2364, 2370 (1982)]. This rule makes

_____

[23]Plaintiffs sought class treatment under Fed. R. Civ. P. 23(b)(2) (which governs claims for injunctive relief) and 23(b)(3) (which governs damages claims).

55

especially good sense when we consider that one of the core purposes of conducting typicality review is to ensure that "the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented."

Thus, it is well-settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim. "[A]ny analysis of class certification must begin with the issue of standing." Griffin v. Dugger, 823 F.2d 1476, 1482 (11th Cir.1987); see also Brown v. Sibley, 650 F.2d 760, 771 (5th Cir. Unit A, July 1981) (stating that the "constitutional threshold [of standing] must be met before any consideration of the typicality of claims or commonality of issues required for procedural reasons by Fed. R. Civ. P. 23"). "Only after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others." It is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to one of many claims he wishes to assert. Rather, "each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim."

Prado-Steiman, 221 F.3d at 1280 (citations omitted). Thus, just as a plaintiff cannot pursue an individual claim unless he proves standing, a plaintiff cannot represent a class unless he has standing to raise the claims of the class he seeks to represent.

For the reasons discussed above, the district court did not err by concluding that Tracy lacks standing to pursue forward-looking relief with respect to UGA's

revised freshman admissions policy. He therefore cannot represent a class seeking that relief.

On the other hand, having now reversed the district court's ruling that Green lacks standing, we must also vacate the denial of class certification to the extent it turned on the notion that Green could not serve as a class representative because he lacked standing to pursue a claim individually. A district court abuses its discretion when it denies class certification based on an incorrect legal premise. See, e.g., Prado-Steiman, 221 F.3d at 1275 n.9 (citing SunAmerica Corp. v. Sun Life Assur. Co., 77 F.3d 1325, 1333 (11th Cir. 1996) for the proposition that a "court necessarily abuses its discretion if it 'has applied an incorrect legal standard'"). Whether Green could serve as representative for a class that would meet the prerequisites of Rule 23(a), and one of the subdivisions of Rule 23(b), is a question for the district court to address in the first instance, not this Court, especially as the district court did not even consider Green as a possible class representative in its ruling denying class certification.[24]

---

[24]Defendants do not argue that we could affirm the denial of class certification even if we were to find that one or more of the Plaintiffs has standing. Although the district court based its denial of class certification partially on concerns beyond standing, we shall not reach out to address those concerns now. The district court, of course, may well conclude that some or all of its earlier concerns still exist even with Green as the proposed class representative.

We note, however, that the district court is not required to resolve Green's class certification request before resolving a challenge to Green's individual claim. If the district court were to resolve a summary judgment motion in Defendants' favor and in so doing dismiss Green's individual claim before ruling on class certification, then Green would not be an appropriate class representative. Again, however, we leave those matters to the district court. We simply hold that the district court's denial of class certification must be vacated to the extent it was premised on the incorrect assumption that Green lacked standing to pursue a claim individually.

## V.

In summary, we dismiss the appeals of Wooden, Jarvis and Bratcher, and affirm the district court's dismissal for lack of standing of the claims brought by Davis and Tracy. We reverse the district court's order entering summary judgment on Green's claim for lack of standing, and vacate the denial of class certification to the extent it was based on the mistaken premise that Green wholly lacked standing. The case is remanded to the district court for further proceedings regarding Green's claim consistent with this opinion.

**APPEAL DISMISSED IN PART, AFFIRMED IN PART, REVERSED AND VACATED IN PART, AND REMANDED.**