Rob FARMER

v.

Dr. David RAMSAY, et al.

No. CIV. L–98–1585.

United States District Court,
D. Maryland.

Aug. 15, 2001.

John Montgomery, Washington, DC, for plaintiff.

Lawrence Paul Fletcher-Hill, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, J. Joseph Curran, Jr., Dawna M. Cobb, Anne L. Donahue, Office of Attorney General, Baltimore, MD, for defendants.

## MEMORANDUM

LEGG, District Judge.

This is a racial discrimination suit. The plaintiff, Rob Farmer, a white male, contends that he was denied admission to the University of Maryland School of Medicine ("UMSM") in 1995 on account of his race.[1] Farmer alleges that he would have been accepted had he been an applicant from an "under-represented minority."[2] Farmer also argues that UMSM's admissions policies are unconstitutional because the admissions committee, in pursuit of a diverse student body, considers the race and ethnicity of applicants when making admissions decisions.

Farmer charges that the Medical School, under a de facto racial quota system, manipulates applicants' "non-cognitive" criteria in order to admit minority students with weak grades and test scores. According to Farmer, UMSM's stated reasons for rejecting him (idiosyncratic personal statements, mediocre science grades, a tepid recommendation letter from his undergraduate school, and an unsatisfactory explanation for a minor arrest record) are merely pretexts for racial discrimination.

The Medical School denies that it operates under a racial quota system. While the School admits that it considers race as a factor in making admissions decisions, it contends that race is merely one of many criteria that it uses in evaluating applications. The University argues that its limited consideration of race to promote the diversity of its student body is narrowly tailored, and, therefore, permissible under *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).

With respect to Farmer's specific claim, the University contends (i) that race did not play any part in the decisions to reject Farmer, (ii) that Farmer's application was so flawed the decision to reject him was not a close call, and (iii) that Farmer would still have been rejected had he been a member of an under-represented minority.

Following extensive discovery and the creation of a lengthy record, the defendants filed a motion for summary judgment; Farmer also filed a motion for partial summary judgment. The Court held two days of hearings. Having carefully considered the record, the Court concludes that there is insufficient evidence from which a reasonably minded jury could find (i) that race played any part in the Medical School's decision to reject Farmer, or (ii) that the Medical School's stated reasons for rejecting Farmer were pretextual. For instance, Towson University, where Farmer took undergraduate science classes, recommended Farmer only with "reservation" in 1994 and 1995 and declined to recommend him at all in 1996. Accordingly, by separate order, the Court will DENY Farmer's motion for partial summary judgment and GRANT Defendants' motion for summary judgment.[3]

1. Farmer filed this action against the University of Maryland at Baltimore; the University of Maryland School of Medicine; Dr. David J. Ramsay, President of UMB; Dr. Donald E. Wilson, Dean of UMSM; and Dr. Milford M. Foxwell, Jr., Director of Admissions for UMSM.

2. The Medical School considers "under-represented minorities" to include African–Americans, Puerto Rico mainlanders, Hispanics, Native Americans, and Alaska natives.

3. The Court reaches this conclusion by applying two related but independent legal tests. Under the first test, a university may defeat liability by showing that an applicant would

## I. Factual Background

### a. UMSM

The University of Maryland School of Medicine is the only public medical school in the State. Admission to UMSM is highly competitive; UMSM admits only about six percent of applicants. In 1995, the School received more than 4400 applications for approximately 140 spaces.

### b. Admissions

UMSM considers applications in four stages. At the first stage, applications are filtered by residency, grade point average (GPA), and scores on the Medical College Admissions Test (MCAT).[4] Applications from Maryland residents are almost invariably sent to the second stage.[5] Many applications from non-Maryland residents with low GPA or MCAT scores, however, are rejected at the first stage.[6]

The School sends surviving applicants a "second stage" application packet, which requests more detailed information. All candidates who complete second-stage applications are considered by the full admissions committee, which meets every week. Each application is assigned to a commit-

tee member, who presents the applicant to the committee and recommends whether the candidate should be interviewed or not. The full committee makes the ultimate decision whether to interview, however.

In stage three, applicants are interviewed in person by two UMSM faculty members. After the interview, the applicant's file is again presented to the committee, which votes either to reject or offer admission (stage four). Rejected applicants may appeal to a subcommittee, which has the authority to send the candidate back to the full committee for further review.

### c. Admissions Criteria

According to the School's catalog, UMSM considers an applicant's "academic achievement, extracurricular activities, personal characteristics, recommendations from the premedical committee or college instructors, scores on the Medical College Admissions Test (MCAT) and personal interview." It is also the School's policy to give special consideration to applicants who have demonstrated leadership or who

not have been admitted even if race were removed as a factor in the decision process. *Wooden v. Bd. of Regents of the Univ. of Ga.,* 247 F.3d 1262 (11th Cir.2001); *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). UMSM has presented an overwhelming record that Farmer was denied admission based on his weak applications.

Under the second test, adapted from the familiar burden-shifting standard that the Supreme Court set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff must present evidence that the University's stated reason for rejecting him is merely a pretext for discrimination. *See Middlebrooks v. Univ. of Md. at College Park,* 980 F.Supp. 824, 831 (D.Md.1997). Farmer has entirely failed to meet this evidentiary burden. Because race

played no role in the decision to reject Farmer, we need not decide whether UMSM's admission system, to the extent that it takes race into consideration, runs afoul of the Constitution.

4. Applicants fill out an American Medical College Admissions Service form, which is used by all medical schools in the United States. The form permits, but does not require, applicants to identify their race or ethnic background.

5. In 1995, only seven Maryland residents were rejected at stage one based on (i) an incomplete application, (ii) failure to take the MCAT, or (iii) actual residency outside of Maryland.

6. In 1995, the admissions committee rejected 2,392 non-resident applications at stage one.

come from communities that lack medical services.

The School's written strategic plan explicitly calls for a "diverse" student body.[7] In pursuit of this goal, the admissions committee uses several outreach programs. One such, the federally funded "Advanced Pre–Medical Development Program" ("the Program"), in which Farmer himself participated, offers free MCAT preparation courses and special admissions counseling to minority and/or poor individuals considering medical school.

Every member of the admissions committee receives a report including the applicant's "objective" data,[8] a personal statement, and letters of recommendation (which are graded, from A+ to F, by the Associate or Assistant Dean of Admissions). According to School policy, committee members are permitted to consider this information as well as what the School terms, "non-cognitive" criteria.[9] An applicant's race is printed on the application; therefore, race is included in the total mix of information a committee member receives when asked to vote to interview or reject a candidate (in the second stage).[10] Of course, the race of an applicant is apparent once the applicant shows up for an interview (stage three).

### d. Rob Farmer

Following graduation from high school, Farmer spent nine years rock climbing, hitchhiking, and juggling. He also worked sporadically as a part-time volunteer EMT at a fire department. In 1987, at the age of 27, Farmer enrolled at the University of Colorado, Boulder to study English, the media, and advertising. Uninterested in a medical career at the time, Farmer took few courses in the sciences.

Farmer completed his studies at Colorado in 1991. The same year, Farmer moved to Maryland to work for his father. This work was the only paid employment experience Farmer listed on his applications. To the admissions committee, Farmer described his job as "fixing houses in the ghetto," which he characterized as "enormously depressing." In late 1994, after this "family business experiment produced unsatisfactory results," Farmer decided to pursue a career in medicine.

Because Farmer's undergraduate course work did not meet basic UMSM's requirements for matriculation, Farmer, from 1992 to 1995, took science courses at Towson University.[11] His grades were, as he concedes, mediocre. Farmer earned a GPA in the sciences of 2.8, receiving "C" grades in several classes, including Basic

7. According to the School, the measures of diversity include "race, ethnicity, age, work, and life experience."

8. Objective data includes an applicant's grades, MCAT scores, undergraduate and graduate institutions attended, degrees earned, age, race, and residency (Maryland, out of state, or international).

9. "Non-cognitive" criteria includes an applicant's (i) geographic origin, (ii) quality of schools attended, (iii) parents' educational background, (iv) work history, (v) past leadership positions, (vi) maturity, (vii) documented interest in medicine or medical research, (viii) past hardships, and (ix) interest in working in a particular community after graduation.

10. While the School admits taking race into account in an effort to achieve diversity, there is no evidence that UMSM segregates applications into different tracks based on race, sets aside a specified number of spots for minorities, or operates under an express quota system. See Lutes v. Goldin, 62 F.Supp.2d 118, 128 (D.D.C.1999). Cf. Talbert v. City of Richmond, 648 F.2d 925, 928 (4th Cir.1981).

11. UMSM requires that applicants complete eight hours each in the biological sciences, general chemistry, and general physics and six hours each in organic chemistry and English prior to matriculation at the School. Farmer's undergraduate record did not satisfy these requirements.

Math & Science, General Chemistry, Organic Chemistry, and Immunology. In April 1994, Farmer took the MCAT for the first time, receiving grades he also concedes were poor.[12]

Farmer applied to UMSM three times: in 1994, 1995, and 1996. Farmer acknowledges that his 1994 application, which included his first MCAT score, was weak and he is not contesting his rejection that year.[13] In 1995, Farmer participated in UMSM's Advanced Premedical Development Program, retook the MCAT, improved his score, and reapplied.[14]

Of the three applications Farmer submitted, his second application, in 1995, was the strongest. His case, therefore, focuses on his rejection that year. Although Farmer also applied in 1996, Towson University refused to recommend him that year, so his application was essentially dead on arrival. Accordingly, the Court will concentrate on UMSM's decision to reject Farmer in 1995.

*Farmer's Second (1995) Application*

Farmer applied to the UMSM for the second time in the spring of 1995 for the 1996 entering class. Because he was a Maryland resident, his application automatically advanced to the second stage. Farmer's file included his entire rejected application from the previous year, his second (and improved) MCAT score, a second

letter of recommendation from Towson University, and additional personal statements. Farmer's grades, employment history, and original MCAT score, were, by definition, unchanged.

Hermione Hicks, the Director of Recruitment for the Office of Admissions at UMSM, presented Farmer's 1995 application to the admissions committee. Hicks noted that Farmer had not held a "significant job" as an adult and had spent "an extreme amount of time" involved in purely recreational activities. Hicks recommended against giving Farmer an interview. After discussion, the committee unanimously voted 14–0 to reject Farmer without an interview.

During discovery, Hicks and other committee members testified that race played no part in the decision to reject Farmer. Instead, they consistently stated that the decision was not a close call given (i) the cool letter of recommendation Farmer received from Towson,[15] (ii) his relatively low GPA from Towson, (iii) his less than average MCAT scores, (iv) the quirky character of his personal statements, (v) Farmer's sparse employment experience, and (vi) the inconsistent, even flip explanations Farmer gave for his minor arrest record. Viewing the record amassed during discovery, there is substantial evidence to support each of these concerns and no credi-

12. Farmer took the MCAT twice: in April 1994 and August 1995. On the 1994 examination, Farmer received the following scores: Verbal Reasoning—11 (85–96 percentile), Physical Sciences—6 (13–27 percentile), Writing Sample—P (63–75 percentile), and Biological Sciences—7 (24–37 percentile).

13. Farmer does not in this suit dispute the rejection of his first application to UMSM. Nevertheless, he used one of his personal statements to argue his view that the academic prerequisites for admission to U.S. medical schools are irrelevant both to selecting qualified medical school students and to a future doctor's ability to practice medicine.

14. On the 1995 MCAT, Farmer received the following scores: Verbal Reasoning—10 (75–87 percentile); Physical Sciences—10 (74–86 percentile), Writing Sample—S (96–99 percentile), and Biological Sciences—9 (56–72 percentile).

15. Hicks also testified that in her more than 10 years of admissions experience, she had "never seen any comment like [the one on Farmer's recommendation] written about" any student she had presented to the committee.

ble evidence that the committee raised them to mask discrimination.

*Farmer's Letters of Recommendation*

By 1995, Farmer's admissions file contained two sets of recommendations from Towson University, a public university located near Baltimore. Towson's Pre–Medical Committee formally evaluates each Towson student who applies to medical school. The Committee, whose longstanding Chair is Dr. Caryl E. Peterson, places students in one of five categories, which, from best to worst, are: (i) highly recommended, (ii) recommended with confidence, (iii) recommended, (iv) recommended with reservation, and (v) not recommended.

In 1994, Farmer received Towson's second lowest recommendation, "recommended... with reservation." In an accompanying letter, Dr. Peterson, who is well regarded by UMSM, expressed "concerns about whether [Farmer's] personality and somewhat inconsistent academic performance will lend themselves to the conventions of the medical profession he hopes to enter." Dr. Peterson's letter was consistent with another letter that Farmer himself solicited from one of his Towson instructors, Chemistry Professor Nordulf Debye. Dr. Debye voiced concerns about Farmer's "willingness to work effectively with others" and his "native intellectual curiosity."

When UMSM first rejected Farmer (in 1994), the admissions committee officially graded Farmer's letter of recommendation a "C," although Associate Dean Milford Foxwell testified that he would have given the letter a "D." [16] In 1995, because of his improved MCAT score, Towson rated Farmer as "recommended," the middle of its five categories.[17] Nevertheless, Dr. Petersen, again writing on behalf of Towson's Pre–Medical Committee, submitted essentially the same letter she had submitted the year before, and continued to express concerns about Farmer.

The first and second letters from Dr. Peterson are virtually identical, word for word; both offer tepid support for Farmer's medical school candidacy. The new recommendation letter received the same "C" grade from the UMSM admissions committee.[18] According to Hicks and Foxwell, a "C" recommendation erects a virtual roadblock to any applicant.[19]

*Farmer's Personal Statements*

Farmer's file included six personal statements.[20] Both Hicks and Foxwell gave

---

16. Dr. Donna Parker, a member of the admissions committee, gave Farmer's recommendation letter its official grade.

17. The evaluation only improved because of Farmer's higher MCAT scores; the text of the recommendations are otherwise identical.

18. In 1996, in connection with Farmer's third application, Towson's Pre–Medical Committee chose not to recommend Farmer. In her letter, Dr. Peterson stated that "serious reservations" precluded "a letter of recommendation in support of Mr. Farmer's application." The UMSM admissions committee gave Peterson's last letter an "F," the lowest possible grade.

19. Discovery failed to produce any applicant (whether majority or minority) with a "C" letter of recommendation who was interviewed or admitted.

20. The six personal statements include: (i) a one-page statement in his 1994 application (for the 1995 entering class), (ii) a one-page statement in his 1995 application (for the 1996 entering class), and (iii) four personal statements totaling ten pages submitted in support of his appeal from UMSM's rejection of his 1995 application. Farmer also submitted a one-page statement in his 1996 application (for the 1997 entering class). Farmer also wrote a personal statement to support his application to UMSM's Advanced Pre–Medical Development Program; that statement was not available to the admissions committee when it reviewed Farmer's second application.

According to Farmer, he submitted three personal statements in support of his first (1994) and second (1995) applications. UMSM claims that Farmer sent those personal statements only in support of his 1995

Farmer's statements, which they regarded as "peculiar," negative marks. From these statements the committee learned that Farmer was raised by his mother and spent his childhood in Virginia, California, Alaska, and Connecticut, with what he describes as "an unusual amount of freedom." About his financial condition, Farmer wrote that, "while not poor, we definitely were not affluent."

Farmer described his path from youth to medical school to the admissions committee as a "long and winding road." Describing the nine years following his graduation from high school, from 1978 to 1987, Farmer wrote that "I lived to climb, and every other aspect of my life was merely an adjunct to support my climbing." Farmer worked part-time as a volunteer EMT during this time, but the only information Farmer provided to the admissions committee about this experience was that "some of the people disliked [him] solely because of the length of [his] hair." Farmer wrote that he chose not to cut his hair because doing so would simply "please some narrow-minded ignoramuses."

Farmer's statements to the admissions committee had other distinctive characteristics. In one personal statement, quoting from the cartoon "Calvin and Hobbes," Farmer advised that doctors should "be careful or be roadkill." In another, Farmer wrote that he is a "fairly macho guy (without the stupidity which that implies, please)."

The admissions committee was concerned in general about Farmer's negative attitude towards medicine. At age nine, Farmer fell out of a tree and broke his arm. According to Farmer, his doctor "pronounced [him] crippled for life—a terrible falsehood to tell a 9–year old boy." In response to this and a number of other interactions with doctors, Farmer expressed strong, negative views of the medical profession. In one personal statement, Farmer wrote that "perhaps most doctors have not read any new medical information in the last 12 years." According to Farmer, "from taking a very unscientific poll, [he has] determined that nearly everyone has a horror story to tell about a doctor."

In sum, Farmer complained about (i) the "absence of compassion" and "ignorance" of a doctor treating his mother, (ii) the incompetence of another physician treating a friend for abdominal pains, (iii) the "substandard" care received by a friend's wife during nasal surgery, (iv) the lack of "common sense" of his own childhood physician, and (v) the "crooked bone in [his] hand" caused by another physician's incompetence.

Farmer also used his personal statements to disparage his fellow applicants to medical school. "Most of the pre-med students I've seen," opined Farmer, "are very good at rote memorization, but they often fall woefully short in areas of common sense, assertiveness, social concern, and knowledge of current events.... Many of my fellow pre-med students have never really even lived on their own—I can't really be expected to compete with them strictly on the basis of grades." In another statement, Farmer wrote, "most of your prospective students are essentially interchangeable units; if one student doesn't fill a need somewhere, someone else will fill the need... that is why it is so important that you accept me."

According to the uncontroverted testimony of Foxwell and Hicks, the admissions committee believed that Farmer's personal statements reflected anger to-

appeal. Although the record is unclear, the Court will assume the committee had the benefit of all three additional personal statements when it reviewed Farmer's 1994 and 1995 applications.

wards the medical profession and condescension towards his prospective classmates. These negative views made Farmer a bad risk for admission, the committee felt.

### Farmer's Criminal History

According to Hicks, Farmer's inconsistent explanations of his arrest record raised concerns about Farmer's credibility and character. Explaining an old criminal mischief conviction on his 1994 application, Farmer wrote that he had been "unjustly accused of damaging a window screen." Farmer wrote without elaboration that he also failed to appear to answer a charge of "illegal dog-walking." On his 1995 application, Farmer claimed that he had merely "once pled 'no contest' to something like 4th degree trespassing." Seeking to clarify the circumstances surrounding his conviction, Farmer further explained that "the woman against whom [he] allegedly trespassed later became [his] girlfriend." [21]

### Admissions Committee Vote

In light of Farmer's weak "C" recommendation, the quality and substance of his personal statements, his uneven academic performance and relatively low GPA from Towson, and his inconsistent explanation for his arrest record, Hicks recommended against offering Farmer an interview. After a discussion of Hicks' presentation, the committee voted, by a unanimous 14–0 vote, to reject Farmer without an interview.

### Farmer's Appeal

Farmer appealed his 1995 rejection. In support, Farmer wrote a four-page letter to Associate Dean Foxwell. In the letter, Farmer erroneously wrote that UMSM graduate was suspected of murder.

Farmer offered this information as proof that UMSM's "method of student body selection is fallible." Arguing why he should be admitted, Farmer wrote that he "would much sooner run than kill." [22]

Farmer also blamed his past academic performance on a host of factors including his car, which was a "major drain of time, money, and energy." In a long digression, Farmer describes his attempt to purchase a cheap car:

> By sitting in the car overnight, I could be the first in line to buy it on Saturday at the special promotional price. I guess it wasn't too bad, but I did get rather scared when the angry black mob (no offense to blacks in general) started banging on and rocking the car at 1:30 a.m. because they were angry at me for arriving first, thus thwarting their ambition to buy a five dollar car. But at least I didn't get beaten up as did the other fellow who claimed a car.

In another part of his letter to the medical school admissions committee, Farmer discusses oil changes:

> Nobody ever changes the oil before selling a car, so it is best to assume that it should be changed immediately. After arriving, I went to run an errand, and the "check oil" light came on. The oil was so worn out that I nearly lost my "new" car the day after I bought it. I swear, my continued existence is so tenuous, it seems my life is continually hanging by a thread!

Foxwell felt that the letter corroborated the admissions committee's earlier concerns about Farmer's emotional stability. Nonetheless, Foxwell accepted Farmer's appeal and submitted it to a committee

---

[21] Farmer's explanation of his arrest record in the 1996 application, that he had been "convicted of trespassing and fined $20," was also inconsistent with the first two explanations, but Hicks did not have this explanation before her in presenting the 1995 application.

[22] In his letter, Farmer also discussed, in length, his fear arising from skin growths that he had left untreated due to his poverty.

(composed of eight admissions committee members), which voted 8–0 to deny the appeal. Farmer was informed of the decision on March 12, 1996. Farmer visited the admissions office without an appointment to protest the rejection of his appeal. Farmer's behavior was sufficiently alarming to cause the staff to call university security.

*Farmer's Third (1996) Application*

Farmer applied a third time, in 1996, for the class entering in 1997. This application was a largely futile gesture because (i) Towson declined to recommend Farmer, stating that the Pre–Medical Committee had "serious reservations" about his candidacy, and (ii) the remainder of Farmer's 1996 application was essentially the same as the 1995 application that the committee had unanimously rejected.

After his applications to UMSM and other U.S. medical schools had been rejected, Farmer attended the only medical school to which he was accepted, the Saba Medical School ("Saba") in the Netherlands Antilles, where he earned a 2.73 GPA. With two years remaining at Saba, Farmer dropped out of medical school altogether. This does not mean that Farmer has abandoned plans for a medical education. Farmer has proffered that he will enter UMSM if the Court orders his admission.

**e. Expert Reports and Evidence Presented by Farmer**

*Evidence Presented by Farmer*

In the absence of direct evidence that he was rejected for reasons of his race or that the UMSM admissions program operates under a racial quota system, Farmer relies primarily upon (i) the existence of UMSM's stated goal of student diversity, (ii) Farmer's own subjective analysis of his application, and (iii) the reports of two experts, Dr. Robert Lerner and Dr. Sally Satel.[23]

*Lerner Report*

Dr. Robert Lerner, a sociologist who has worked on several articles critical of affirmative action in higher education, attempts to "demonstrate that Farmer was more qualified than the Program attendees whom UMSM admitted."[24] Lerner's two reports are essentially divided into three sections: (i) a comparison of Rob Farmer's MCAT scores with the scores of certain admitted under-represented minority students, (ii) a comparison of the MCAT scores of admitted white UMSM students with the scores of admitted under-represented minority UMSM students overall, and (iii) the relationship between undergraduate grades, MCAT scores, and subsequent performance in medical school.

In part one of his report, Lerner compares Farmer's MCAT scores with those of four African–American students who attended the Program with Farmer and were subsequently admitted to UMSM.[25] Lerner highlights the fact that student B12 received a significantly lower MCAT score than Farmer.[26] Lerner concedes, however, that student B12's other qualifications were stronger than Farmer's: a science GPA of 3.58 compared with a 3.0 for Farmer; an overall GPA of 3.73 compared with 3.41 for Farmer; and recom-

---

23. Dr. Satel's report is actually a set of two affidavits, totaling 14 pages.

24. The "Program" is the same federally funded "Advanced Pre–Medical Development Program" discussed *supra,* in which Farmer also participated.

25. These four students are identified as students B12, B19, B1–1996, and B2–1996. All four students are African Americans.

26. Student B12 received the following MCAT scores: Verbal Reasoning—5, Physical Sciences—6, Writing Sample—M, and Biological Sciences—6. For Farmer's MCAT scores, *see supra* n. 14.

mendation of "recommended with confidence" which received an "A-" grade from the UMSM admissions committee.[27]

Lerner also acknowledges that student B2-1996, who had lower MCAT scores than Farmer, possessed academic qualifications that were stronger than Farmer's: a science GPA of 3.85 compared with a 3.0 for Farmer; an overall GPA of 3.81 compared with 3.41 for Farmer; and a strong recommendation from the University of Maryland at College Park, which received an "A" grade from the UMSM admissions committee.[28] Despite a lower MCAT score, student B19 also had a better academic record than Farmer: an overall GPA of 3.47 from Cornell University; a science GPA of 3.21; and a recommendation from Cornell which received a "B+" grade from the UMSM admissions committee.[29]

Despite his concession that all four students who attended the Program with Farmer had stronger (or as he contends in one case, similar) academic credentials, Lerner asserts that "Farmer is more qualified for admission to UMSM than the four Program attendees." Lerner justifies his conclusion by minimizing the importance of undergraduate grades because of the "well-known subjectivity of grades as measures of student achievement." Thus, Lerner concludes, for example, that it is "quite reasonable to discount applicant B12's high grades as indicating superior qualifications to Farmer."

Lerner's comparison of Farmer's credentials to those of all under-represented minority students who were admitted to UMSM yields similar results: while many minority applicants to UMSM had lower MCAT scores than Farmer, 77% of African–American applicants and 88% of other under-represented minority applicants had higher undergraduate science GPAs than Farmer. Based solely on this data, Lerner concludes that "no black enrollee (with one possible exception) is more qualified than Farmer."

In part two of his report, Lerner compares the grades and MCAT scores of white and Asian admitted students with those of admitted students from under-represented minorities.[30] Lerner's find-

27. Student B12's recommendations were glowing: "[B12] is an extremely good candidate for medical school... She has been extremely successful at [Loyola College, which is located in Baltimore] doing A to A- work for her whole academic career, while carrying a combined Biology/Chemistry major... We enthusiastically support [B–12's] application to medical school. We believe that she has the academic, intellectual, emotional and social skills to master the medical school curriculum and to become an excellent physician." B12's recommendation also included a statement that the "Health Preprofessional Committee evaluates all pre-med students by identical criteria. No consideration has been given in this evaluation to the fact that a student belongs to an under-represented minority."

28. Student B2–1996's recommendations were very strong: "[B2–1996] has maintained a 3.8 GPA while a major in biology.... In three of six semesters here, [B2–1996] earned straight A's, once while completing three lab courses... All in all, [B2–1996] is an impressive student and person... Her career in medicine will continue to evidence high levels of academic excellence and humane compassion. [B2–1996] has my absolute highest recommendation for admission."

29. According to Dr. Jean R. Robinson, Chairperson of Cornell's Health Careers Evaluation Committee, "It is with great pleasure that we recommend [B19]. She is a fine human being and one of our most well rounded and accomplished students, whose commitment to excellence in medicine is unexcelled. We have no doubt that she will be an outstanding physician and make important contributions to the field."

30. According to Lerner's report, minorities that are "non-preferred" include Chinese, Hawaiian, Korean, Asian Indian, Pakistani, Vietnamese, and "other" Asian. Lerner's report lumps the grades and MCAT scores of whites

ings are, in many respects, similar to those made in the first part of his report: the average MCAT score of an under-represented minority applicant is lower than the average MCAT score of a white or Asian applicant.[31] Unstated in Lerner's report, however, is the fact that the average UMSM applicant's overall GPA and science GPA (for whites, Asians and all under-represented minorities alike) were higher (and in some cases substantially so) than Farmer's.

The third and final part of Lerner's report addresses whether grades and MCAT scores are a good proxy for performance in medical schools. Lerner concludes that MCAT scores, college grades, and college science grades are indeed correlated with subsequent medical school performance, with MCAT scores constituting the single most predictive factor.[32]

█ The Defendants have filed a motion to strike Dr. Lerner's report because

Farmer hired Lerner on a contingency basis. When questioned about this at oral argument, Farmer's counsel explained that his client lacked the funds necessary to pay an expert in advance. This explanation is unsatisfactory. Under the common law in most jurisdictions, including Maryland, "it is improper to pay an expert witness a contingent fee." Md. Rules 16–812, Rules of Professional Conduct 3.4 cmt. (2000).[33] As Chief Judge Motz of this Court observed, "witness contingency fee agreements affirmatively violate the fundamental policy of Maryland and the United States." *Accrued Financial Services, Inc. v. Prime Retail, Inc.*, 2000 WL 976800 at *3 n. 3 (D.Md. June 19, 2000). See *Cosgrove v. Sears Roebuck and Co.*, 1987 WL 33595 (S.D.N.Y. Dec.21, 1987).[34]

Accordingly, the Court will, by separate order, grant defendants' motion and strike Lerner's reports. Even if the reports were admitted, however, they would add

in with those of their "non-preferred" minority counterparts. Lerner provides, therefore, a comparison between white applicants (a group Farmer belongs to) and non-preferred" minority applicants (a group Farmer does not belong to) on the one hand, and under-represented minorities minorities on the other.

31. There is a substantial union between the two groups. For example, 29% of under-represented minority applicants have combined MCAT scores between 40 and 44; 24% of whites and Asians have similar scores. A performance gap is apparent at the two ends of the MCAT score range, however: 31% of under-represented minority applicants have combined MCAT scores between 35 and 39; only 10% of whites and Asians have similar scores; similarly, 35% of whites and Asians have combined MCAT scores between 45 and 49; whereas only 9% of under-represented minority applicants have similar scores.

32. Farmer's own performance at Saba undermines the empirical value of Lerner's MCAT correlation analysis. According to Lerner, "an individual's MCAT scores alone have considerably stronger correlations with his or her

performance than do his or her grades: a .67 correlation with 1 year medical school GPA, [and] a .64 correlation with year 1 and 2 cumulative school GPA." Farmer's MCAT scores were significantly higher than student B12. Ultimately, however, Farmer earned a two-year cumulative GPA of 2.73 at Saba, while student B12 earned a slightly higher two-year cumulative GPA of 2.77 at UMSM.

33. In § 1983 claims, Congress explicitly provided that, absent a suitable federal law provision, "the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction... is held... shall be extended to and govern the said courts in the trial and disposition of the cause." 42 U.S.C. § 1988. See *Wilson v. Garcia*, 471 U.S. 261, 281, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985).

34. In *Accrued Financial*, this Court held that "financial arrangements that provide incentives for the falsification or exaggeration of testimony threaten the very integrity of the judicial process which depends upon the truthfulness of the witnesses." 2000 WL 976800 at *3.

little, if any, weight to Farmer's case. As discussed *infra*, Farmer can withstand summary judgment only if he can offer credible evidence that (i) race played a role in the decision to reject him, or (ii) that the admissions committee's stated reasons for rejecting Farmer without an interview were pretextual.

Lerner's report does show a gap between the MCAT scores of whites (and Asians) and under-represented minorities. The report sheds no light, however, on whether (i) Farmer was passed over in preference for a minority applicant, or (ii) Farmer himself would have been admitted had he been the member of a different race. In analogous Title VII cases, the Fourth Circuit has repeatedly held that "raw statistics devoid of any context which relates those statistics to the alleged discriminatory practice are of minimal probative value." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 454 (4th Cir.1989) (citations omitted).[35]

*Satel Report*

Farmer's second expert witness, Dr. Sally Satel, is a staff psychiatrist at a methadone clinic in Washington, D.C. and self described specialist in the field of mental health policy and drug abuse. Satel served on the admissions committee of the Yale University School of Medicine in the early 1990s. In her affidavits, Satel compared Farmer's 1996 application with those submitted by four African American applicants who were admitted.

Satel argues that Farmer's overall application is better (or at least not worse) than two of the African–American applications she reviewed. Satel opined that an applicant from an under-represented minority group with Farmer's credentials would have been accepted by UMSM. According to Satel, the most important factor in an application to Yale Medical School is the applicant's MCAT scores, followed closely by an applicant's grades. The same is true, "at other medical schools around the country," Satel opines, although without corroboration.

◼ The Defendants have filed a motion to strike Dr. Satel's report on the grounds that it lacks the necessary indicia of reliability required under FRE 702. The Court agrees and will, by separate order, grant the motion. Satel offers little more than her personal opinion of Farmer's application and the weight that UMSM should have placed on his MCAT scores.

Satel has no familiarity with UMSM; she lacks an extensive background in medical school admissions; she reviewed a total of only five applications; her work has not been subjected to any peer review; and her opinions are not based on a methodology that can be tested. Accordingly, her views lack the indicia of reliability required under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See Samuel v. Ford Motor Co.*, 96 F.Supp.2d 491, 493 (D.Md.2000).

Even if Dr. Satel's report were admissible, the Court could not accord it much, if any, weight. As stated, the report consists

---

**35.** Lerner's numerical comparison of applicants' qualifications also has a serious weakness. Farmer acknowledges that Lerner's analysis includes only "qualifications that could be expressed numerically." Consequently, under Lerner's analysis, a science GPA of 3.0 from a highly competitive and selective school is considered the same as a science GPA of 3.0 from a less competitive one. This shortcoming may be especially important because many of the African–American candidates to UMSM attended highly selective undergraduate institutions. For example, student B19 attended Cornell University and earned a science GPA of 3.21, compared to Farmer's 3.0 science GPA from Towson. Despite this, Lerner concludes that "the grade gap between Farmer and B19 is small."

entirely of Satel's personal evaluation of the applications. A plaintiff's (or his expert's) personal evaluation of his own qualifications is, however, irrelevant. Courts have repeatedly held that such subjective personal judgments do not raise a genuine issue of material fact. *See Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir.1980); *Bradley v. Harcourt, Brace and Co.,* 104 F.3d 267, 270 (9th Cir.1996); *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 456 (4th Cir. 1989).

*Applications of Minorities Not Interviewed*

In an attempt to uncover evidence in his favor, Farmer proposed one other form of comparison between his application and applications from under-represented minorities. At oral argument, Farmer's attorney challenged the University to produce the application of any African–American candidate with a "C" recommendation and an academic record similar to Farmer's who was *not* interviewed.

In response, the School proffered that no African–American applicant with a recommendation letter rated lower than a "B" was interviewed. The University also produced the application of an African–American female student from Cornell University. Cornell's letter of recommendation did not contain anything similar to the negative language in Towson's recommendation. The letter was, by any measure, a stronger endorsement than Farmer's.[36] The admissions committee also gave the letter a "C" grade and the African–American applicant was not granted an interview.

**36.** According to Dr. Jean R. Robinson, Chairperson of Cornell's Health Careers Evaluation Committee, the student's undergraduate record could be "characterized as a studied ef-

## II. Summary Judgment Standard

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial).

Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987). In order to survive summary judgment, the non-moving party must present evidence from which a reasonable jury could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Discussion

Farmer makes two claims for relief. The first is retrospective; he seeks an order requiring the Medical School to admit him because he was rejected for discriminatory reasons. The second is prospective; even if the court does not order his admission, Farmer intends to reapply and seeks an order barring the Medical School from using race as an admissions criterion in the future.

fort at building academic and personal confidence" and the student had "come a long way in her efforts at Cornell."

*Retrospective Relief*

The Court will first analyze Farmer's claim for retrospective relief under two separate but related tests. The first, the "same decision" test, is discussed in a recent decision from the Court of Appeals for the Eleventh Circuit. *Wooden v. Bd. of Regents of the Univ. of Ga.*, 247 F.3d 1262 (11th Cir.2001).

In *Wooden*, the University of Georgia contended that it would have rejected the plaintiff regardless of any constitutional violation, and that he, therefore, lacked standing to challenge the University's admissions process. Applying the Supreme Court's reasoning in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Eleventh Circuit classified the university's "same decision" argument as a complete defense on the merits rather than a challenge to standing. *Wooden*, 247 F.3d at 1280.

■ Under the "same decision" defense, a university may defeat liability by showing that an applicant would not have been admitted even if race had played no role in the decision process. *See Wooden*, 247 F.3d at 1281. This Court finds the *Wooden* analysis persuasive and consistent with current Supreme Court precedent.[37]

■ The second test, outlined in *Middlebrooks v. University of Maryland at College Park*, 980 F.Supp. 824, 831 (D.Md. 1997), adapts to university academic decisions the familiar burden-shifting standard that the Supreme Court set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To withstand summary judgment, a plaintiff must present evidence that the University's reason for rejecting him is merely a pretext for discrimination.

■ Under neither of these tests can Farmer withstand summary judgment. As an initial proposition, courts are ill-advised to serve as super-admissions committees, replacing schools' professional judgments with their own. *See Wharton v. Abbeville School Dist. No. 60*, 608 F.Supp. 70, 75 (D.S.C.1984); *Lee v. U.S.*, 914 F.Supp. 489, 493 (N.D.Ala.1996). The Supreme Court has instructed that judges are to show "great respect for the faculty's professional judgment" when asked to review academic decisions. *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 225, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985).

■ This Court may intervene only if Farmer can offer evidence from which a reasonable jury could conclude (i) that race played a role in the decision to reject him or (ii) that the admissions committee's stated reasons for rejecting him were pretextual. This Farmer cannot do.

Farmer offers no direct evidence of discrimination. To the contrary, all of admissions committee members who were asked testified that Farmer's application was so weak that rejecting him was not a close call and that race played no part in the decision.

As stated above, in the absence of direct evidence of discrimination, Farmer is forced to rely on (i) the mere existence of UMSM's stated goal of student diversity,

---

**37.** "Simply put, where a plaintiff challenges a discrete governmental decision as being based on an impermissible criterion and it is undisputed that the government would have made the same decision regardless," relief is not warranted. *Texas v. Lesage*, 528 U.S. 18, 21, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999); *see also Mt. Healthy*, 429 U.S. at 287, 97 S.Ct.

568. *Cf. Northeastern Florida Chapter*, 508 U.S. at 666, 113 S.Ct. 2297 (noting that though a government-contracts plaintiff need not show that it would have won the contract but for consideration of race, it yet must "demonstrate that it is able ... to bid on contracts"); *see also Hopwood v. Texas*, 78 F.3d 932, 957 (5th Cir.1996).

(ii) testimony that the School's admissions committee may take race into consideration as one factor out of many, (iii) his own subjective analysis of his application, and (iv) the reports of his experts.

These factors are unavailing. There is no evidence that UMSM operates a racial quota system under which it sets aside a certain number of spots for under-represented minorities or that it automatically upgrades minority applications. Simply because the committee may take race into consideration does not mean that race was necessarily a factor in Farmer's rejection.[38]

Farmer was not a candidate high on the waiting list; he cannot, therefore, plausibly argue that the seat he would have otherwise received was given to a minority applicant with a lesser resume. Farmer's resume was weak relative to the others UMSM received; of the 4,466 applications submitted, Farmer was among the 3,800 applicants rejected without an interview. Of the 518 candidates who survived to the interview stage, only 299 were accepted. Because hundreds of applicants with MCATs and GPAs better than Farmer's were also rejected, Farmer would not even have qualified for a spot on the "interview" waiting list, if such a waiting list existed.

Farmer cannot reasonably contend that he would have been accepted under an admissions scheme that employed only evenly applied objective criteria. Instead, Farmer's only plausible argument is that he would have been admitted if the same

arguably diluted standards applied to minorities were applied to him alone out of all the white or Asian candidates. Even this argument fails, however. UMSM has produced credible evidence that all applicants, minority and majority alike, with academic records and "C" letters of recommendation similar to Farmer's were neither accepted nor interviewed.[39]

Farmer's own evaluation of his application and belief that he should have received an interview is irrelevant. As this Court has repeatedly stated in Title VII cases, a plaintiff's own subjective belief that he is sufficiently qualified is insufficient to counter substantial evidence of legitimate nondiscriminatory reasons offered by a defendant.[40]

There is also no evidence that the admissions committee manufactured a reason (as a pretext for discrimination) to deny Farmer admission on account of his race. The admissions committee has pointed to concern over Farmer's poor undergraduate science grades, his lack of work experience, the troublesome personality traits reflected in his personal statements and letter of appeal, and his inconsistent explanation for a minor arrest record.

All of these concerns are fully supported by and documented in the record. Given the extremely competitive nature of medical school admissions, with only 143 slots available for 4,466 applicants, any one of the negative factors in Farmer's applications, considered alone, would be sufficient

---

38. Despite Farmer's contention to the contrary, no evidence supports the proposition that the school's goals for diversity constitute illegal "quotas" for the number of minorities that are interviewed or accepted. *See supra,* n. 10.

39. Relying on Satel's report, Farmer also argues that his recommendation letter should have received a higher grade. But no other letter in the record, for a white or minority candidate, casts explicit doubt upon the via-

bility of an application; Farmer's recommendations do. Furthermore, because the UMSM explicitly acknowledges the consideration of race in the admissions process, the University has no reason to skew its analysis of applicants' recommendation letters. Farmer has submitted no evidence from which the Court can infer that the University does so.

40. *See* discussion and citation to cases *supra,* p. 885.

to preclude his admission to the UMSM. No reasonable juror reviewing the record could conclude (i) that Farmer would have been interviewed, much less accepted, had he been a minority applicant, or (ii) that Farmer would have been interviewed or accepted if race had played no role whatsoever in the admissions process, or (iii) that concerns about Farmer were "made up" in order to reject him.

*Prospective Relief*

■ Whether and to what extent a public university may consider race in admissions has been a matter of considerable recent debate as has the separate but related question of who may challenge a university's admissions practices.[41] Having reviewed the full record created during discovery, the Court concludes that Farmer should not be permitted to pursue a "generally available grievance about government," as the Supreme Court has "consistently held." *Lujan*, 504 U.S. at 573, 112 S.Ct. 2130. *See FEC v. Akins*, 524 U.S. 11, 20, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998); *Allen v. Wright*, 468 U.S. 737, 761, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for the Separation of Church and State*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

Farmer reads *Adarand* and its progeny as granting him the right to an injunction forbidding the use of race as a factor in the UMSM admissions process, even though Farmer's own application under that process would be futile. *Adarand Constructors v. Pena*, 515 U.S. 200, 211, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995); *see also Northeastern Fla. Chapter of the Associated Gen. Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). *Adarand* cannot be stretched that far. Such a reading would presumably permit even applicants lacking the requisite formal qualifications to challenge a medical schools' admissions processes merely by stating an intent to apply.

This Court does not believe that *Adarand* so abrogated the Supreme Court's regular and consistent teaching on the constitutional limits of standing. *See Lujan*, 504 U.S. at 576, 112 S.Ct. 2130; *see also Friends of the Earth v. Laidlaw*, 528 U.S. 167, 191, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Friends of the Earth v. Gaston Copper Recycling*, 204 F.3d 149, 153 (4th Cir.2000).

Although Farmer, like any person, has the potential to improve his resume, only a much stronger application would have a chance of success. Unless and until Farmer improves his application markedly, his claim is simply too speculative. *See Proctor v. Prince George's Hosp. Center*, 32 F.Supp.2d 830, 833 (D.Md.1998); *Baltimore Gas and Elec. Co. v. U.S.*, 133 F.Supp.2d 721, 727 (D.Md.2001).[42]

**41.** Recent cases in other federal circuits have cast doubt upon the continuing force of Justice Powell's opinion in *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (holding that universities may consider race as a factor in admissions but may not impose numerical racial quotas). *See Hopwood v. State of Texas*, 78 F.3d 932 (5th Cir.1996); *Grutter v. Bollinger*, 137 F.Supp.2d 821 (E.D.Mich.2001), *stayed pending appeal by* 247 F.3d 631, 633 (6th Cir.2001). *But see Smith v. Univ. of Washington, Law School*, 233 F.3d 1188, 1200 (9th Cir.2000); *Gratz v. Bollinger*, 122 F.Supp.2d 811 (E.D.Mich.2000). Because the weaknesses of Farmer's application doomed it regardless of his race, the Court need not reach this constitutional question. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346, 56 S.Ct. 466, 80 L.Ed. 688 (1936).

**42.** Farmer is among the "abstractedly distressed," not the "truly afflicted." *Friends of the Earth*, 204 F.3d at 154.

## IV. Conclusion

For the reasons stated above, this Court shall, by separate Order, GRANT defendants' Motion for Summary Judgment.