[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-15358
Non-Argument Calendar
_____

D.C. Docket No. 3:14-cv-01402-MMH-JBT

ALDORA ALUMINUM & GLASS PRODUCTS, INC.,

Plaintiff-Appellant,

versus

POMA GLASS & SPECIALTY WINDOWS, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(March 27, 2017)

Before JORDAN, ROSENBAUM, and BLACK Circuit Judges.

PER CURIAM:

Aldora Aluminum & Glass Products, Inc. (Aldora) appeals from the dismissal of its breach of contract claim following the district court's grant of summary judgment in favor of Poma Glass & Specialty Windows, Inc. (Poma). Aldora asserts the district court misapplied controlling Florida law and erred in finding the agreement between the parties, as reflected in their Memorandum of Understanding (MOU), was unenforceable. Aldora further contends the district court improperly resolved a factual dispute when it found the parties continued negotiation of a material term in the MOU after signing the document. Finally, Aldora insists Poma breached its duty to act in good faith and otherwise failed to meet Aldora's reasonable commercial expectations under the MOU. After review, we affirm.[1]

## I. BACKGROUND

*A. Facts*

Poma operated several commercial glass fabrication plants across the United States, including a facility located in Jacksonville, Florida. Aldora, another glass manufacturer, was interested in purchasing manufacturing equipment from Poma and taking over the lease of Poma's Jacksonville manufacturing plant in the

---

[1] We review a "district court's grant of summary judgment de novo applying the same legal standards used by the district court." *Galvez v. Bruce*, 552 F.3d 1238, 1241 (11th Cir. 2008). "Summary judgment is appropriate where 'there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Wooden v. Bd. of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262, 1271 (11th Cir. 2001) (quoting Fed. R. Civ. P. 56(c)).

process.  To that end, Leon Silverstein, Aldora's CEO, began negotiating a deal to purchase the needed equipment with Christopher Correnti, a vice-president at Poma.  During these preliminary discussions, Aldora reached out to Poma's landlord at the Jacksonville facility, William "Mac" Eason, to discuss taking over the lease for the building.

On September 4, 2014, the parties executed a MOU in which Poma agreed to sell Aldora its glass fabrication equipment at the Jacksonville plant for $825,000.00.  The MOU indicated it was legally binding on the parties, but it also provided the equipment sale was subject to several conditions.  In particular, the sale was conditioned on "Poma and Aldora individually working out *acceptable agreements* to transition the Jacksonville Site and provide a lease thereof to Aldora and to allow Poma to exit the facility with the landlord for that site prior to closing."  (emphasis added).  The MOU did not define "acceptable agreements," nor did it provide any guidance identifying relevant lease criteria for the respective parties.  The parties did not even discuss what each might consider an acceptable lease transition agreement for the Jacksonville plant.  The MOU also specified a closing date for the transaction, October 31, 2014.[2]

Neither party disputes that reaching an "acceptable arrangement" to transition the lease of the Jacksonville facility was a material part of their

---

[2] The parties eventually agreed to extend this deadline to November 7, 2014.

3

agreement.  Mr. Silverstein testified that Aldora was not "just going to buy the equipment assets and not end up operating and leasing the building."  Indeed, he indicated that Aldora "would not have even pursued the MOU if [it] didn't think [it] could get a lease."  For its part, Poma explained in email communication with Aldora "[s]elling just the equipment is not why we made this proposed deal."

Prior to signing the MOU, Aldora independently communicated proposed lease terms to Eason, the landlord of the Jacksonville facility.  These terms included, among other things, six months of rent free tenancy and a $150,000.00 tenant improvement allowance.  Aldora apparently hoped that the costs of these terms could be incorporated into any early lease termination deal Eason might reach with Poma.  When the MOU was signed, Poma had about 18 months left on its existing rent agreement, and began negotiating early exit terms with Eason.  These negotiations went poorly, and when the MOU deadline expired Poma was offering about $400,000.00 less than Eason was demanding to terminate the lease early.[3]  No agreement between Poma and the landlord was ever reached.

As the negotiations between Poma and Aldora over the Jacksonville facility progressed, Poma's parent company, AGC Glass Company North America (AGC), was negotiating with Trulite Glass Company (Trulite) to purchase AGC's entire

---

[3] Aldora eventually agreed to pick up the difference, but failed to communicate this commitment until November 14, 2014, a full week after the MOU's extended closing deadline had lapsed.

North American commercial glass fabrication business.[4]  On October 27, 2014, representatives for Trulite's parent company Sun Capital Partners, Inc. (Sun Capital) indicated they expected Poma's Jacksonville facilities and equipment to be included in the broader sale.  On November 3, 2014, Trulite reached a preliminary agreement with AGC regarding the Jacksonville plant and equipment, formally concluding the deal a few weeks later.[5]

B.  *Procedural History*

Aldora filed suit against Poma in the Middle District of Florida on November 11, 2014 asserting claims for breach of contract claim, breach of the implied covenant of good faith and fair dealing, and promissory estoppel.  On December 22, 2014, Poma moved to dismiss Aldora's claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Poma asserted that an essential term of the MOU, the requirement that the parties reach "acceptable" lease transition agreements, was indefinite rendering the document legally unenforceable.  Relying solely on the pleadings, the district court denied Poma's motion on July 6, 2015 finding the material terms of the MOU were clearly defined and enforceable.

---

[4] Deposition testimony indicated that although they were technically separate entities, AGC and Poma were considered identical by management of the company.

[5] Aldora continually emphasizes the influence the pending deal with Trulite had on Poma's conduct following the execution of the MOU.  Indeed, communications between Trulite and AGC do suggest that Poma was attempting to "kill" the deal with Aldora.  But, as we will discuss, these backchannel dealings have no impact on whether Poma was legally bound by the MOU.  Because we determine Poma was not so bound, the company's good faith performance, or lack thereof, is irrelevant to the instant dispute.

After extensive discovery, Poma filed a motion for summary judgment on March 16, 2016 again arguing the MOU was unenforceable because a material provision of the agreement was never adequately defined. This time, the district court agreed, finding the undisputed evidence showed that reaching an acceptable agreement to transition the lease from Poma to Aldora was a material term of the contract. Because this material term was left undefined and open to further negotiations between the parties, the district court held that MOU was not legally enforceable and dismissed Aldora's claims against Poma. This appeal follows.

## II. DISCUSSION

In Florida, an enforceable contract exists only if, among other things, the parties to the contract have sufficiently defined all essential terms of the agreement. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2010). [6] "The creation of a contract requires that there be mutual assent to a certain and definite proposition." *ABC Liquors, Inc. v. Centimark Corp.*, 967 So. 2d 1053, 1056 (Fla. 5th DCA 2007). "If the essential terms [of the contract] are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *David v. Richman*, 568 So. 2d 922, 924 (Fla. 1990) (quoting Restatement (Second) of Contracts § 33 cmt. a (Am Law Inst. 1981)); *see also Irby*

---

[6] The plain terms of the MOU provide that "Florida law will govern this sale excluding its conflict of laws provision." Here, both parties accept that Florida law governs our interpretation of the MOU.

6

*v. Memorial Healthcare Grp.*, 901 So. 2d 305, 306 (Fla. Dist. Ct. App. 2005) (noting that "[w]hile it is not necessary that all details of an agreement be fixed in order to have a binding agreement between parties, if there has been no agreement as to essential terms, an enforceable contract does not exist") (quotations omitted).

There is no dispute that negotiating acceptable agreements for transitioning the commercial lease between Poma and Aldora was an essential term of the MOU. Neither party contends the MOU was intended to memorialize a simple asset sale. Instead, the glass fabrication assets were primarily valuable to Aldora because they would enable the firm to more quickly bring the Jacksonville facility online. And, similarly, those assets held the most value to Poma as leverage to enable them to more easily terminate their lease of the Jacksonville plant. In short, the undisputed evidence reveals that the MOU was intended to outline both a simple asset sale, and a more complex lease transition agreement between the two parties.

The enforceability of the MOU depends entirely upon whether the lease transition provision provided a sufficiently definite basis to determine whether the agreement had been kept or broken. A mere agreement to agree "is unenforceable as a matter of law." *ABC Liquors*, 967 So. 2d at 1056. And, similarly, a contract containing ambiguous material terms is unenforceable because "the parties never reached a meeting of the minds regarding an essential term of the agreement."

*King v. Bray*, 867 So. 2d 1224, 1227 (Fla. 5th DCA 2004). Here, the undisputed facts show the parties realized the lease agreements required under the MOU were "linked to one another," but still failed to set parameters for what might constitute mutually "acceptable" lease agreements. The record reveals the parties did not even discuss how the complex commercial lease transition could be accomplished and conclusively establishes the parties did not "mutual[ly] assent to a certain and definite proposition" as required by Florida law. *ABC Liquors, Inc.*, 967 So. 2d at 1056. We conclude the terms of the MOU are indefinite, at best constituting a mere agreement to agree in the future, rendering the agreement unenforceable as a matter of law.

It is true that the MOU indicates the parties intended the document to be "legally binding." It is also true that "[w]here the parties have intended to conclude a bargain, uncertainty as to incidental or collateral matters is seldom fatal to the existence of the contract." *David*, 568 So. 2d at 924 (quotations omitted).[7]

---

[7] Aldora contends that because reaching ex ante lease transition agreements was impossible, and the MOU clearly reflected the parties' intent to be bound, the MOU adequately defined all essential terms and should be enforced. *See Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 408 (Fla. 1974) (explaining that "[e]ven though all the details are not definitely fixed, an agreement may be binding if the parties agree on the essential terms and seriously understand and intend the agreement to be binding on them"). We agree with Aldora that reaching "acceptable" lease transition agreements without first negotiating with the landlord, Mr. Eason, was impossible. Indeed, Aldora helpfully lists a whole string of possible considerations that might have influenced the landlord's approach to lease negotiations and impacted the ability of the parties to reach "acceptable" transition agreements. But these difficulties do not suggest the MOU was enforceable because the parties defined their obligations as best they could under the circumstances. Instead, these myriad factual possibilities suggest

But, the terms of the lease transition are not a collateral or incidental matter. Instead, as the parties both accept, the lease transition lies at the very core of their negotiation. And, the parties agree that they did not even discuss what might constitute an "acceptable" lease transition agreement under the MOU. This is not a case where the parties provide the broad parameters of an agreement but include room for discretion in fulfilling particular contractual duties. The MOU is simply silent regarding the critical information needed to conclude a vital aspect of the parties' agreement. The undefined term "acceptable agreement" simply provides "no basis for deciding whether the [MOU] has been kept or broken." *David*, 568 So. 2d at 924. At most, this language represents an agreement to agree on lease terms at some point in the future: a proposition that we can afford no legal remedy because "there [is] no way to determine whether the parties would have reached an agreement."[8] *State, Dept. of Corr. v. C & W Food Serv.Inc.*, 765 So. 2d 728, 730 (Fla. 1st DCA 2000); *see also CSX Transp., Inc. v. Professional Transp., Inc.*, 467

---

the parties were simply not in a position to reach a legally binding agreement because they lacked sufficient information to adequately define a material element of the deal. The "unimaginable number of possible scenarios" stemming from potential lease negotiations with the landlord serves only to highlight that the MOU could serve only as an unenforceable agreement to agree at some future time.

[8] The district court found that not only were the lease terms insufficiently definite for enforcement, Poma and Aldora actually continued to negotiate the lease transition indirectly via the landlord, Mr. Eason. Aldora contends this finding was error and improperly resolved a disputed material fact in favor of the moving party. However, this factual finding is not necessary to our conclusion regarding the MOU's enforceability, and so we do not address this argument.

F. Supp. 2d 1333, 1339–40 (M.D. Fla. 2006) (explaining a mere agreement to negotiate something in the future gives rise to no enforceable obligations because it is impossible to determine what agreement, if any, would have been reached).

Aldora seeks to avoid this commonsense conclusion by arguing the lease transition term in the MOU represents a routine condition precedent sufficiently definite to bind Poma despite retaining some room for the exercise of discretion during performance. And, consequently, Poma was bound to negotiate in good faith with the landlord to satisfy the condition and meet Aldora's reasonable contractual expectation under the MOU. This argument fails for two reasons.

First, it never addresses the core question presented in this case: whether an enforceable contract existed in the first instance. Aldora is correct to argue that contracts requiring negotiations with third parties and affording broad discretion in the performance of specific contractual duties are commonly enforced. *See Martorella v. Deutsche Bank Nat'l Trust Co.*, 931 F. Supp. 2d 1218, 1226 (S.D. Fla. 2013) (enforcing a contract that afforded the parties "discretion in determining whether to purchase . . . insurance after a policy had lapsed, and under what terms"); *Seaside Cmty. Dev. Corp. v. Edwards*, 573 So. 2d 142, 145–47 (Fla. Dist. Ct. App. 1991) (enforcing a contract that required third party financing approvals as a condition precedent to rendering performance under the contract). But, in all of the cases relied on by Aldora, there is no question that an enforceable contract

10

exists.  Here, the MOU simply lacks "sufficient specification of the essential terms" to qualify as an enforceable agreement under Florida law.  *Vega*, 564 F.3d at 1272.  And, Aldora presents no case law suggesting otherwise.

Second, Florida law does not recognize a claim for the breach of the implied covenant of good faith and fair dealing absent the existence of a valid contract.  Instead the duty only "attaches to the performance of a specific contractual obligation."  *Centurion Air Cargo, Inc. v. United Parcel Serv., Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005); *Hospital Corp. of Am. v. Florida Med. Ctr., Inc.*, 710 So. 2d 573, 575 (Fla. 4th DCA 1998) (assuming the existence of an enforceable contractual obligation before applying the duty of good faith).[9]  Because we have determined the MOU was not a legally binding contract imposing specific obligations on the parties, Poma was not bound by the implied covenant of good faith and fair dealing under Florida law.

## III. CONCLUSION

It is undisputed that a material part of the contemplated transaction between Aldora and Poma required the early termination of Poma's commercial lease to its Jacksonville facility and Aldora's subsequent acquisition of a new lease to the property.  It is also undisputed that the MOU between the parties specified they

---

[9] Aldora seems to recognize this basic precept of Florida law by explaining that "under Florida law, a party's failure to engage in 'fair dealing' in carrying out a contractual duty *in itself* constitutes breach of an otherwise enforceable contract."

11

must reach "acceptable" lease transition agreements before any deal could move forward. The record reflects neither Poma nor Aldora discussed the terms of potentially "acceptable" lease arrangements, or defined criteria for such arrangements in the MOU itself. Even though the parties may well have intended to be bound by the MOU, there is no way for us to enforce the obligation to reach an "acceptable" lease transition agreement without any parameters at all regarding the content of such an agreement. As the district court explained "[t]he terms of the [MOU] simply provide no basis for the Court or a jury to determine what terms Poma would be required to pay the landlord to terminate the lease, or what Aldora should have to offer the landlord to take over the lease, in order to satisfy an obligation that the parties reach 'acceptable agreements.'" Indeed, "there [is] no way to [even] determine whether the parties would have reached" acceptable lease agreements in the first instance. *C & W Food Serv.*, 765 So. 2d at 730. At best, the MOU constitutes a mere agreement to agree and is unenforceable as a matter of Florida law. *ABC Liquors*, 967 So. 2d at 1056. And, since we find that no enforceable contract ever existed, the fact that Poma may or may not have acted in good faith following execution of the MOU is of no legal significance. We affirm the district court's grant of summary judgment in favor of Poma.

**AFFIRMED.**

12